NORTH CAROLINA     FILED     IN THE GENERAL COURT OF JUSTICE
ORANGE COUNTY                 SUPERIOR COURT DIVISION
                                          18-CVS-___

| | |
|---|---|
| PROFESSOR DOE [1] ) | **COMPLAINT** |
| ) | |
| Plaintiff, ) | **STATE AND FEDERAL DUE PROCESS** |
| ) | **VIOLATIONS ARISING FROM TITLE** |
| v. ) | **IX (20 U.S.C. § 1681) HEARINGS,** |
| ) | **PETITIONS FOR JUDICIAL REVIEW,** |
| THE BOARD OF GOVERNORS OF THE ) | **BREACH OF CONTRACT,** |
| UNIVERSITY OF NORTH CAROLINA, THE ) | **CONSTRUCTIVE DISCHARGE AND** |
| UNIVERSITY OF NORTH CAROLINA AT ) | **STATE AND FEDERAL FREE SPEECH** |
| CHAPEL HILL, CAROL FOLT in her official ) | **VIOLATIONS(42 U.S.C. § 1983),** |
| capacity as Chancellor of The University of ) | **DEFAMATION, BREACH OF** |
| North Carolina at Chapel Hill, ANN LEMON ) | **CONFIDENTIALITY, NEGLIGENCE,** |
| in her official capacity as Assistant Provost for) | **DECLARATORY JUDGMENT,** |
| Academic Personnel, and KENNETH T. ) | **INJUNCTIVE RELIEF, & CORUM** |
| ANDREWS in his official capacity as Chair of ) | **CLAIM** |
| the Department of Sociology ) | |
| ) | **(JURY TRIAL DEMANDED)** |
| Defendants. ) | |
| ) | |
| ) | |
| ) | |

Plaintiff ("Professor Doe" [1]), by and through counsel, complaining of Defendants, alleges and says:

## SUMMARY OF ACTION

1.  Professor Doe seeks justice for the unconstitutional obliteration of his reputation and career by the very students and institution to whom he devoted an entire life's work. Under mounting public and federal pressures to "get tough" on Title IX, State actors have here traded Truth for Praise.

2.  This case is about the Truth: (i) that Professor Doe has never in his life sexually harassed any person, and (ii) that once upon a time Professor Doe entered a failing grade for a failing student who retaliated against him by falsely alleging sexual harassment as a desperate Parthian shot calculated to avoid her otherwise imminent and meritorious expulsion.

---

[1] Pursuant to case law discussed *infra*, due to the nature of the allegations in this lawsuit Plaintiff proceeds under the pseudonym "Professor Doe" and identifies his accuser as "Jane Roe."

3. That a frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty.

4. Professor Doe asks patience from this Court for a longer than typical Complaint and cites the complexity of the case and the unprecedented bar set by the prevailingly bleak national atmosphere of litigation for litigants such as he who seek to challenge Title IX actions, as well as the ever-changing tides in the federal executive branch and Department of Education in particular, which have cast long overdue doubt on the status quo of Title IX procedures since 2011.

5. For the benefit of this Court Professor Doe here summarizes the facts of this complex and multifaceted Complaint which are pleaded with greater particularity in sections succeeding this section:

### SUMMARY OF THE FACTS

i. As of May 7, 2015 Jane Roe was a graduate student at The University of North Carolina at Chapel Hill ("UNC") Department of Sociology ("department") who had previously earned an "L" ("low-pass") in two core courses in her graduate program and who—if she received one (1) more "L" in any course—would lose her student-visa, be expelled from the program, and likely be deported from the United States of America. Furthermore that Jane Roe has been described by more than one tenured professor at UNC as "the worst" graduate student in the entire history of the department.

ii. As of May 7 Jane Roe was enrolled in a core graduate course ("the course") taught by Professor Doe, a (then) tenure track professor, and furthermore that this was a course whose difficulty Jane Roe had been cautioned of by another faculty member who was familiar with Jane Roe's academic struggles.

iii. Prior to 2015 Professor Doe was considered by his community as an exemplary instructor, colleague, and mentor with no prior grievances of any kind since his employment by UNC in 2009.

iv. On May 8 Jane Roe's final grade in the course was calculated by Professor Doe and a grade of "L" was entered, which should have been Jane Roe's third and final "L" effectuating her expulsion.

v. On May 8 Jane Roe hysterically harassed and stalked Professor Doe at his office, across campus, (at times even grabbing him around the waist as he tried to get away) and into the parking deck where she stood behind his car and would not let him leave, pleading for him to change her grade and stating: "I'll do anything, please [Professor Doe] … Do you want to be responsible for … my life being ruined?" That Professor Doe had to verbally and physically repel and admonish Jane Roe.

-2-

vi.     Professor Doe refused to change the grade.

vii.     There was nothing Professor Doe or Jane Roe could do because: Jane Roe's receiving yet another "L" shocked no one in the department who had taught her. Jane Roe had simply maintained her declining academic trajectory and earned yet another "L."

viii.     May 8 was a Friday.

ix.     The next business day (Monday, May 11) Jane Roe suddenly decided to report purported sexual harassment by Professor Doe through UNC's Title IX/EOC office ("EOC") which had, allegedly, been constant and ongoing for an entire half-year.

x.     Though Jane Roe had failed her other courses fair and square, this course alone was purportedly all Professor Doe's fault.

xi.     On May 14 Jane Roe met with another EOC officer to again formally request an investigation of Professor Doe.

xii.     On May 19 Jane Roe showed the real purpose of her sexual harassment allegations by filing a formal Grade Appeal of her "L" grade citing the (then) conveniently pending sexual harassment investigation.

xiii.     Although the Grade Appeal Committee would ultimately find no error in Professor Doe's grading whatsoever, they would nonetheless be forced to "consider" the EOC claims and, in so doing, would, under real and perceived pressure from UNC, begrudgingly be compelled to let Jane Roe retake the course.

xiv.     Jane Roe's graduate school career at UNC has included disciplinary actions that should have informed an unbiased finder of fact regarding her tendency for truth telling, including but not limited to: multiple counts of flagrant plagiarism on papers and comprehensive graduate exams, false claims concerning absences from class, and false claims concerning grades achieved.

xv.     Jane Roe's EOC filings, Grade Appeal filings, and testimony at hearings and interviews were based on demonstratively and substantially false information, all to shield a juvenile avoidance of being held accountable for failing a (third) class.

xvi.     The sexual harassment claim outrageously and falsely accused Professor Doe of placing his hand on Jane Roe's inner thigh for periods of approximately ten (10) seconds and, in one version, for a total of ten (10) separate occasions from the vague and unspecified range of dates from "the fall" of 2014 to March 19, 2015.

-3-

xvii. That between Jane Roe's EOC Complaint, Grade Appeal, EOC investigative interview, and SGC hearing testimony there would come to exist multiple versions of "the number" of sexual harassment occurrences, to the end that not only were Jane Roe's allegations false: they were not even consistent.

xviii. The prior outstanding fact must be repeated with emphasis: Of the "ten" times Jane Roe alleges Professor Doe sexually assaulted her from "the fall" of 2014 to March 19, 2015 she **never** has provided (and was **never** asked to provide) **any** specific date or time for the assault(s).

xix. That Jane Roe could not even provide evidence of ever being in Professor Doe's office ten (10) specific times at all, sexually harassed or otherwise.

xx. From May to August of 2015, an investigation by the EOC office was conducted which violated Professor Doe's substantive and procedural due process rights under the state and federal constitutions, as detailed below.

xxi. On August 24, 2015 the EOC's Confidential Administrative Review Report ("the EOC Report') was issued and found, in part, that Professor Doe had sexually harassed Jane Roe—on no specific date or time and on no specific number of times—and included a reprimand limited to a brief, one-time training on sexual harassment for Professor Doe.

xxii. That the EOC did not (because it could not) ever specify any specific date(s), time(s), or number(s) of these purported assaults.

xxiii. That supplemental recourse to the anonymous course evaluations is of no avail, as neither course Jane Roe completed under Professor Doe included an even slightly negative review by any student (meaning that Jane Roe did not negatively review Professor Doe even when she could have anonymously).

xxiv. Jane Roe appealed the EOC Report—because she thought UNC should have fired Professor Doe—to the Student Grievance Committee ("SGC") and from August 2015 to January, the SGC appeal was conducted in a manner which violated Professor Doe's substantive and procedural due process rights under the state and federal constitutions, as detailed below.

xxv. There was no listed option for the accused (Professor Doe) to appeal the EOC Report.

xxvi. On November 2, 2015 the Grade Appeal Committee's findings were summarized in a memorandum penned by Dean Hartlyn: the committee had found that Jane Roe indeed deserved the grade of "L," but that in light of the EOC Report they could not objectively say whether she would not have also received an "L" under a different professor, so she was permitted to retake the course. (Technically, the Grade Appeal Committee found that they would have assigned an even lower failing grade to Jane Roe.)

xxvii. On January 12, 2016 the SCG Hearing Outcome was published affirming the findings and recommendations of the Report, including a reprimand limited to increasing sexual harassment training for Professor Doe.

xxviii. From January 2016 to June 30, 2018 Professor Doe was permanently damaged by inappropriate and illegal activities (detailed below) from various Defendants which culminated in his constructive discharge from UNC (and free speech violations by UNC) after being defamed and stripped of nearly all teaching privileges, committee posts, and abilities to interact with students such that his employment was intentionally made intolerable to force him to leave; and that this occurred in extreme excess of the reprimands advised by the EOC and SGC and instead represent UNC capitulating to extreme outside public pressures which impermissibly worked the injustice that Professor Doe was essentially guilty *because* charged.

xxix. To this day Professor Doe and several of his students and tenured faculty colleagues vigorously maintain his absolute innocence and his total deprivation by Defendants of proceedings even remotely resembling due process.

xxx. Throughout both parts of this timeline Professor Doe was repeatedly pressured and advised (including by some Defendants) not to appeal or challenge UNC given the risk it would pose to his employment in light of the charged national atmosphere regarding sexual harassment.

xxxi. That on June 25, 2018 the Office of Civil Rights through the Department of Education issued a Letter of Findings stemming from a multi-year investigation (ongoing while Professor Doe was accused and convicted) which made factual findings that UNC failed to adequately implement certain Title IX protections for both parties, as described in detail below.

xxxii. Jane Roe and other named or well-alluded-to persons in this Complaint usually entitled to confidentiality under 20 U.S.C. § 1232g ("FERPA") have voluntarily waived/forfeited said confidentiality, i.e., 'opened the door,' by their pernicious defamation of Professor Doe—in revealing the specifics of the allegations, investigations, findings, and

reprimands on multiple occasions to third parties other than Professor Doe who do not qualify under UNC policy [2] as "need to know" persons—and should therefore be estopped from attempting to bind Professor Doe from seeking justice herein through naming their ill deeds, which may unintentionally reveal their identities.

6. This is a multifaceted action framed below as issuing from two distinct parts of the above general timeline: Part-I being the events precipitating the May 2015 to January 2016 Title IX/EOC investigation and SGC appeal; and Part-II being the cruel and unconstitutional treatment of Professor Doe by Defendants post January 2016.

7. As Professor Doe is a strong supporter of the spirit of Title IX and has the heart of a true professor, he does not herein name Jane Roe or the other malfeasant actors who are all his former students.

8. Professor Doe could[3] name Jane Roe and the other malfeasant student actors.

9. The real party in interest is The Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity by and through their agents, employees, and administrators.

10. Everyone can promise they will not commit a crime, but no one can promise they will not be charged, which is why the United States of America has a balanced and checked justice system. In this case, UNC's responsibility to execute a quasi-judicial function failed. This comes as a surprise to no one, as it is only ever a matter of time before there is a miscarriage of justice in a setting where justice is being administered by those not trained in the law. Professor Doe makes no accusation that all Title IX hearings violate procedural due process rights, but does allege that in quasi-judicial settings such rights are much more at risk than normal, and furthermore that in this case his rights were violated.

11. At university Title IX hearings one and the same entity (the University) (i) contracts with all parties, as students or employees, (ii) writes all polices, (iii) enforces all policies, and (iv) adjudicates the interpretation of all policies. Put differently, the universities are made 'judges in their own cases,'[4] a threat to justice avoided at all costs since the earliest days of the Common Law.

---

[2] See, Policy on Prohibited Discrimination, Harassment and Related Misconduct Including Sexual and Gender-Based Harassment, Sexual Violence, Interpersonal Violence and Stalking, §§ III (C) and VII (A) (effective and last revised 8/28/14) (https://unc.policystat.com/policy/4514917/latest/) (accessed July 10, 2018 at 11:41 AM).

[3] Students who are unnamed in this action likely could have been named and would be estopped from defending with statutory confidentiality because they voluntarily waived of any confidentiality afforded under federal law due to their own intentional past and ongoing acts of publicizing the information herein to third/public parties, to the extent of defaming Professor Doe.

[4] "Aliquis non debet ess judex in propria causa, imo iniquum est aliquem suae rei esse judicem" (Because someone ought not be a judge in his own cause, for it is unfair for someone to be a judge in his own affairs). Dr. Bonham's Case, 8 Co. Rep. 107a, 118a, 77 Eng. Rep. 638, 652 (1610); see also, Kendall v. Stafford, 178 N.C. 461, 101 S.E. 15, 13 (1919) ("It is an ancient maxim, applicable in all cases, civil or

12. In the words of a renowned litigator who has stood on both sides of the isle in Title IX proceedings, "Justice is not the result, it's the process. We give ourselves over to a system. We lose, we win. We hate losing, but you are able to at least say: 'I couldn't have asked the judge to do more than he did. He listened, he thought, he read.' Here [Title IX] you are not having that experience."[5]

13. In the words of a retired female federal judge now Harvard law professor, the Hon. Nancy Gertner, "It [Title IX proceedings] is the worst of both worlds, the lowest standard of proof coupled with the least protective procedures."[6]

14. That the Hon. Gertner and three (3) other female, feminist Harvard law professors who have "researched, taught, and written on Title IX, sexual harassment, sexual assault, and feminist legal reform" jointly penned an article in 2017 excerpted at length here to survey the severity of issues at stake and the mounting national recoil against what has been the status quo since 2011:

> ... In the past six years, under pressure from the previous Administration, many colleges and universities all over the country have put in place new rules defining sexual misconduct and new procedures for enforcing them ...
>
> In 2011, OCR issued a "Dear Colleague Letter" which gave colleges and universities instructions on how to regulate this area. That document was never opened for notice and comment and as a result does not itself have the force of law and could not add new obligations for regulated parties. Nevertheless the previous Administration's OCR threatened colleges and universities with the institution-wide cutoff of all federal funding if they did not comply with the Dear Colleague Letter's instructions, including ones that had never before been considered legally required by Title IX. **Terrified, administrators not only complied; they over-complied** ....
>
> **Definitions of sexual wrongdoing on college campuses are now seriously overbroad.** They go way beyond accepted legal definitions of rape, sexual assault, and sexual harassment. They often include sexual conduct that is

---

criminal, where judicial functions are to be exercised, whether in proceedings of inferior tribunals or in courts of last resort, that no man ought to be a judge in his own cause, a maxim which appeals with such force to one's sense of justice that it is said by Lord Coke to be a natural right so inflexible that an act of Parliament seeking to subvert it would be declared void.") (internal quotations and citations omitted).

[5] Kathryn Joyce, *The Takedown of Title IX*, N.Y. Times, Dec, 5, 2017 (available at https://www.nytimes.com/2017/12/05/magazine/the-takedown-of-title-ix.html) (accessed July 10, 2018 at 4:28 PM) (quoting Andrew T. Miltenberg).

[6] *Id.*

merely unwelcome, even if it does not create a hostile environment, even if the person accused had no way of knowing it was unwanted, and even if the accuser's sense that it was unwelcome arose after the encounter .... Overbroad definitions of sexual wrongdoing are unfair to all parties, and squander the legitimacy of the system.

Though OCR did not require schools to treat accused students unfairly in the investigation and adjudication process, its tactics put pressure on them to stack the system so as to favor alleged victims over those they accuse. <u>The procedures for enforcing these definitions are frequently so unfair as to be truly shocking.</u> Some colleges and universities fail even to give students the complaint against them, or notice of the factual basis of charges, the evidence gathered, or the identities of witnesses .... Some schools deny the parties the right to see the investigative report or get copies for their lawyers for preparing an appeal ....

... Some Title IX officers even take on the role of advisor to an accuser through the process of complaint, investigation, adjudication, or appeal, which means they are not neutral. They do so, moreover, without providing analogous support of the accused.
...

Compounding matters, many institutions follow the "investigator only" or "single investigator" model, wherein the investigator is also the adjudicator. In this model, there is no hearing. One person conducts interviews with each party and witness, and then makes the determination whether the accused is responsible. No one knows what the investigator hears or sees in the interviews except the people in the room at the time. This makes the investigator all-powerful. Neither accuser nor accused can guess what additional evidence to offer, or what different interpretations of the evidence to propose, because they are completely in the dark about what the investigator is learning and are helpless to fend off the investigator's structural and personal biases as they get cooked into the evidence-gathering.

These common arrangements together offend two requirements of fairness; *neutral* decision makers who are independent of the school's compliance interest, and *independent* decision makers providing a check on arbitrary and unlawful decisions.

These substantive and procedural fairness issue are exacerbated by OCR's requirement that institutions use

a **preponderance of the evidence standard** rather than a higher standard such as clear and convincing evidence. ...

...

... Only when schools adopt both fair procedures and fair substantive definitions will the sanctions they levy send the message that sexual misconduct is unacceptable. Now, instead, they send a dreadful message, that fairness is somehow incompatible with treating sexual misconduct seriously. That message is wholly unnecessary.

...

**The unfairness that currently infects colleges and universities' procedures is in no way necessary to address the problem of sexual misconduct.** Indeed, it is counter-productive, undermining the legitimacy of the important project of addressing sexual misconduct ....

Elizabeth Bartholet, The Hon. Nancy Gertner, Janet Halley & Jeannie Suk Gersen, *Fairness For All Students Under Title IX* (Aug. 21, 2017) (accessed on July 6, 2018 at 8:36 AM) (http://nrs.harvard.edu/urn-3:HUL.InstRepos:33789434) (bolded emphasis added; italicized emphasis in original).

15. Following the exhaustion of all adequate administrative remedies which would not be futile or inadequate as shown by supporting authority below and which exceed mere anticipation or prediction, Professor Doe now brings this action against Defendants for the following <u>summarized</u> claims detailed and pled at length and with particularity in the sections succeeding this section:

### SUMMARY OF CLAIMS

i. Civil claim against The Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity as UNC's chancellor for violation of Title IX in allowing an erroneous outcome fueled by an impermissible gender bias which far exceeded mere "pro-victim" sentiments by all of the following: expressly by one of Jane Roe's key witnesses who testified against Professor Doe yet later stated she had a "natural suspicion and distrust of men accused of sexual harassment" and was willing to "start a war" over "gender issues" at UNC if necessary to get them taken "seriously"; indirectly and inferentially by the Administrative Reviewer who did not disclose the credibility limitations of Jane Roe's key witness, which limitations she was informed of; and indirectly and inferentially by UNC in general in light of the ongoing Department of Education investigation into the campus EOC office, the general campus atmosphere as evidenced by public statements by UNC's administrators—all of which impermissibly affected the Title IX proceedings;

ii.   Civil claim against The Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity as UNC's chancellor for violations of Professor Doe's procedural due process rights under both state and federal constitutions which implicate and stigmatize Professor Doe's hallowed liberty interest in his reputation by all state actor defendants for the numerous and rank procedural inadequacies of the Title IX proceedings which cast articulable doubt on the accuracy of the outcome based on the record before the disciplinary tribunal including but not limited to said proceedings: (1) being arbitrary and capricious, (2) involving substantially false information, (3) lacking a disinterested tribunal, (4) substantially departing from academic norms, (5) giving only perfunctory explanations for findings and recommendations, and (6) failing to give Professor Doe adequate notice of the specific charges brought against him which disabled Professor Doe from preparing a meaningful defense.

iii.  Civil claim for constructive discharge of Professor Doe from his place of employment against The Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity as UNC's chancellor for deliberately making Professor Doe's working conditions intolerable thereby forcing him to not renew his contract <u>and</u> state and federal free speech violations under the same facts to the extent Defendant State actors demoted and terminated Professor Doe because of his exercise of protected speech which was of concern to the public in declaring his innocence from the monstrous claims that he was a deviant sexual harasser, which claims were causing objective, measurable alarm in the community;

iv.   Civil claim for substantially breaching Professor Doe's valid contract for employment, against The Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity as UNC's chancellor.

v.    Civil claim against Defendants The Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity as Chancellor of UNC, by and through their agents, employees, and administrators for defamation of Professor Doe by slander *per se* for spoken publication to individuals other than Professor Doe accusing Professor Doe of having committed the crime or offense of sexual harassment when she knew or should have known that statement was false;

vi.   Civil claim against The Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity as UNC's chancellor for negligence in: not carrying out the EOC and SGC proceedings with reasonable care and with due regard for the truth, and not following internal UNC procedures.

vii. Declaratory judgment action determining the rights and obligations of the parties pertaining to the inaccurate and misleading information from the Title IX proceedings in Professor Doe's personnel file and for injunctive relief in the form of this Court ordering the official state actor (Ann Lemon) to remove from Professor Doe's personnel file the inaccurate and misleading information from the Title IX proceedings;

viii. Motion for preliminary injunction enjoining the department head (Defendant Kenneth T. Andrews) below from exercising his discretion under N.C. Gen. Stat. § 126-24 pending the resolution of the declaratory judgment action in that regard, insofar as Professor Doe herein shows the likelihood of his success on the merits in said action and further shows he is likely to sustain irreparable loss without the award of the preliminary injunction;

ix. Motion for injunctive relief enjoining Defendants The Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity as Chancellor of UNC, by and through their agents, employees, and administrators from further defamation by slander *per se*, or otherwise, pending the resolution of the civil claim in that regard, insofar as Professor Doe herein shows the likelihood of his success on the merits of said defamation claim and further shows he is likely to sustain irreparable loss without the award of the preliminary injunction.

x. Civil claim against Carol Folt in her official capacity as Chancellor of The University of North Carolina for Professor Doe's right to make a *Corum* claim for remedying violations of his constitutional rights in the face of the inadequacy or else inaccessibility of an alternative state common law or statutory remedy;

xi. Prayer for relief that any civil claim, declaratory judgment action, or motion for injunction herein pleaded be judicially construed—if and only if deemed necessary—as a timely petition for judicial review pursuant to N.C. Gen. Stat. § 150B-45(a) or alternatively, in the case deemed untimely, pursuant to N.C. Gen. Stat. § 150B-45(b) for good cause shown.

16. The most poignant summary of the type of flagrant procedural wrongs endured by Professor Doe was provided in the wake of the EOC Report while the SGC appeal was pending by his UNC supervisor and department chair Kenneth T. Andrews, who privately stated in a closed door session: **"[Professor Doe], it isn't about what you did or didn't do at this point. It's about perception, and what these students are willing to do, not just to you but to the department, even me."**

17. Contrary to this remark by a UNC agent/employee all too indicative of the "guilty when charged" times which have predominated these disciplinary courts since the infamous (now formally withdrawn as of 2017)[7] 2011 Dear Colleague Letter and 2014 Questions and Answers circulated to universities such as UNC by the Department of Education's Office for Civil Rights to guide their administration of, *inter alia*, Title IX's EOC proceedings, **Professor Doe now seeks redress from a genuine court bound by the Rule of Law—not the Rule of Zeitgeist—and alleges: It is precisely (and only) about what Professor Doe did or did not do.**

## PARTIES, JURISDICTION, & VENUE

18. That all preceding paragraphs are specifically incorporated by reference and are specifically re-alleged as though laid out in full herein.

## PARTIES

19. That this Court is vested with the requisite personal jurisdiction over all parties named to this action as follows:

   i. That at all relevant and material times Professor Doe has been and is a resident citizen domiciled in Orange County, North Carolina. Furthermore that until June 30, 2018 Professor Doe was an assistant professor with his employer, The University of North Carolina at Chapel Hill ("UNC").

   ii. That at all relevant and material times Defendant The University of North Carolina has been and is a body politic and corporation, having the capacity to be sued, pursuant to N.C. Gen. Stat. § 116-204(7).

   iii. That pursuant to N.C. Gen. Stat. § 116-4 Defendant The University of North Carolina is comprised of constituent institutions of higher education, including UNC, thus all knowledge, acts and omissions to act alleged herein as attributable to UNC and its administrative officers is alleged to have been the knowledge, acts and omission to act of The University of North Carolina.

   iv. That UNC is an institution of higher education located, operated, managed in Orange County, North Carolina for over 200 years.

   v. That at all relevant and material times Carol Folt has been and is the Chancellor of UNC and is named only in her official capacity pursuant

---

[7] "The Department of Education is also withdrawing the Dear Colleague Letter on Sexual Violence dated April 4, 2011, and the Questions and Answers on title IX Sexual Violence dated April 29, 2014. The withdrawn documents ignored notice and comment requirements, created a system that lacked basic elements of due process and failed to ensure fundamental fairness." Department of Education, September 22, 2017 Press Release (https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct, last visited June 5, 2018) (emphasis added).

to N.C. Gen. Stat. § 116-34 for being the administrative and executive head and exercising "complete authority" therein, subject to direction from the President of the University.

vi. That at all relevant and material times Ann Lemon has been and is the Assistant Provost for Academic Personnel and is named only in her official capacity pursuant to the injunctive relief prayed for by Professor Doe under N.C. Gen. Stat. § 126-25(b), namely the correction or removal of the inaccurate and misleading information in his personnel file.

vii. That at all relevant and material times Kenneth T. Andrews has been and is the department head of the department in which Professor Doe was employed, and that Defendant Andrews is named in his official capacity pursuant to the injunctive relief prayed for by Professor Doe under N.C. Gen. Stat. § 126-24, namely the enjoining of Defendant Andrews from exercising his discretionary disclosure powers as department head to allow Professor Doe's personnel file to be inspected or examined.

## JURISDICTION

20. This Court is vested with the necessary subject matter jurisdiction as follows:

i. This Court is generally vested with subject matter jurisdiction over Professor Doe's state and federal constitutional claims, constructive discharge claim, breach of contract claim, and defamation claim which are each and all cognizable claims of a civil nature under N.C. Gen. Stat. § 7A-240.

ii. This Court is specifically vested with subject matter jurisdiction over Professor Doe's declaratory judgment action and injunctive relief pursuant to N.C. Gen. Stat. § 7A-245(a).

iii. Though Professor Doe brings all claims as original actions and not as Petitions for Judicial Review under N.C. Gen. Stat. § 150B-145, nonetheless if this Court finds it necessary to so construe Professor Doe's actions *as* petitions that Professor Doe in that case and for such claim(s) alone does then bring said claim(s) as Petitions for Judicial Review timely filed under N.C. Gen. Stat. § 150B-145(a) or else untimely under N.C. Gen. Stat. § 150B-145(b) but for good cause shown (detailed below) as Professor Doe either acted in good faith expectation that further appeal was not necessary or wise insofar as:

a. He relied on UNC to <u>only</u> reprimand him within the scope so laid out in the EOC Report and SGC Notice of Hearing Outcome;

b. He faced mounting pressures from his supervisor and department head to not further appeal, insofar as he was being

continuously punished (in excess of the reprimands) by the eroding removal of his professional responsibilities and an appeal would only have exacerbated those tensions;

c. He faced intensifying campus opposition through those who expressly stated to him personally they would "start a war" on "gender issues" if needed to have them taken "seriously";

d. He faced a department and campus-wide chilling pressure to not appeal within a futile and inadequate system that would only punish him for doing so;

e. He was aware of the ongoing Department of Education Investigation of UNC's EOC office;

f. He was aware of the increasingly zealous prosecution of Title IX claims which would later be shown in the year of 2014 to 2015 to have increased by over fifty-two percent (52%); and

g. He was not provided adequate notice by UNC policy procedures[8] referenced by the SGC Notice of Hearing Outcome of the thirty day limit of his (timely) appeal rights in N.C. Gen. Stat. § 150B-145(a).

21. That the State is divested of any defense of sovereign immunity in:

i. Cases brought under Title IX;

ii. Cases arising out of contracts entered into;

iii. *Corum* claims prosecuted in the name of the individual State actor;

iv. Declaratory Judgment Actions prosecuted in the name of the individual State actor; and

v. Injunctive relief sought against individual State actor.

### VENUE

22. That venue is shown to be properly with this Court as follows:

i. That at all relevant and material times Professor Doe has been and is now a resident and citizen of Orange County, North Carolina.

---

[8] *See,* Procedures for Reporting and Responding to Complaints of Discrimination, Harassment, and Related Misconduct Involving a Student as a Reporting Party and a University Employee as a Responding Party § III(Œ)
(https://eoc.unc.edu/files/2015/05/Procedures_for_Reports_by_Students_Against_Employees1.pdf)
(accessed July 10, 2018 12:23 PM).

ii. That at all relevant and material times a majority of Defendants have been named in their official capacities as employees or administrators for The University of North Carolina at Chapel Hill, an institution of higher education located, operated, and managed in Orange County for over 200 years.

iii. At all relevant acts to the Complaint occurred in Orange County, North Carolina.

## FACTS

23. That all preceding paragraphs are specifically incorporated by reference and specifically re-alleged as though laid out in full herein.

24. That as stated above, this action stems from a timeline that is most effectively presented in two parts as divided by the date of the Student Grievance Committee ("SGC") "Notice of Hearing Outcome" distributed on January 12, 2016.

## Part I
### (Facts prior to January 12, 2016)

25. That Professor Doe began employment with UNC in 2009, being the top choice candidate from a highly selective applicant pool.

26. That Professor Doe worked for UNC under contract for six (6) years without ever receiving a complaint or concern from any student or colleague regarding sexual deviancy of any kind.

27. That Professor Doe has never in his life—aside from the allegations at UNC—been accused of a crime of moral turpitude.

28. That Professor Doe was known at, and known by, UNC as a safe and trusted advisor to vulnerable community members, insofar as:

i. In 2011 Professor Doe was listed (and participated) as a formal interviewee in support of another female UNC community member who faced sexual harassment; and also that

ii. In a year not identified for confidentiality purposes, but prior to 2015, Professor Doe was specifically tasked with successfully mentoring a female UNC community member laboring under severe psychiatric hardships, including successfully deescalating a potential suicide incident.

29. That by 2014 Professor Doe had justified ambitions to earn tenure within the UNC Department of Sociology, was designated as a "tenure track" faculty

member, and was proceeding upon said "track" towards tenure based on, among other professional pedigree credentials, his reputation.

30. That in addition to his subject matter erudition, Professor Doe's immensely positive reputation on campus was intimately connected with his joviality, warmth, compassion and camaraderie in the classroom.

31. That in addition to his exceedingly positive classroom presence, Professor Doe was a "legendary" social committee member and, later, committee chair.

32. That Professor Doe has technically had innocuous "physical contact" with many students and colleagues in forms such as: high fives, handshakes, an arm around the shoulder, holding of a hand in an emotional crisis, or a friendly punch in the arm, or (the act at issue in this case) a fist bump to the outer knee of someone seated next to him.

33. That all who know Professor Doe—including Jane Roe, before it benefitted her later to falsely re-characterize the above conduct as unwelcome to avoid expulsion and likely deportation—would describe this conduct as the sort often associated with successful encouragement, such as 'There it is!' 'Ata-boy!' or 'Correct!'

34. That Professor Doe first met Jane Roe in August, 2014 at which time she was a graduate student in a graduate course he taught.

35. That on or about Thursday October 2, 2014 Jane Roe came to Professor Doe's office sobbing about possible deportation for an event unrelated to Professor Doe. That Professor Doe offered her a tissue and listened to her at length, including a brief period during which the two held hands during an instance of particularly strong crying by Jane Roe.

36. That Jane Roe was so comforted by, appreciative of, and clearly not offended in any way by Professor Doe's above described support that on October 7 she actually followed up with an email expressly thanking him for the support he gave her on that day, even concluding the email with "Love, [Jane]".

37. That nonetheless, at the conclusion of the 2014 fall semester Jane Roe did not perform at a passing level and was only shielded from yet another "L" at the good grace of Professor Doe, who, like all professors, had the right to adjust scores within certain margins.

38. That based on her shoddy performance in the fall course, Professor Doe verbally informed Jane Roe that she had only barely "passed" the fall course.

39. That Professor Doe warned Jane Roe on multiple occasions that his more advanced course in the spring of 2015 would require considerably greater improvement than she had shown in the fall of 2014.

-16-

40. That Jane Roe nevertheless enrolled in Professor Doe's spring 2015 course ("the course") but failed to improve her performance as Professor Doe had instructed.

41. That by early February Jane Roe was already failing the course.

42. That on March 24, 2015 Professor Doe's supervisor, Defendant Kenneth T. Andrews, had a meeting with Professor Doe where he told Professor Doe a student had anonymously complained solely regarding the issue of Professor Doe's office quarters being too tightly arranged and that it was sometimes awkward to meet with Professor Doe because of the narrow desk configuration.

43. That this March 24 meeting is later the subject of hindsight revisionist tampering by UNC through its agents, namely: that it was later alleged by UNC that at this time Professor Doe was in fact then advised also regarding physical touch from EOC complaints. That this is impossible for two reasons:

    i. The March 24 meeting could not have stemmed from an EOC complaint[9] because under UNC policy Professor Doe would have had to receive written notice of the charges (which he never received, because there were no March charges); and

    ii. The March 24 meeting could also not have stemmed from a student(s)'s report of conduct actually rising to the level of possibly violating UNC policy, because if it had then Defendant Kenneth T. Andrews would have been in breach of his duty as a "Responsible Employee" under UNC policy[10] (having both administrative and supervisory responsibilities over both students and employees) for not having himself reported it to the EOC, which report he did not do because of the facts alleged in the immediately preceding paragraph, i.e., no notice to Professor Doe evidencing EOC charges.

44. That, regarding what the March 24 meeting actually pertained to (office furniture): Professor Doe had his desk arranged "tightly" as a collateral consequence from his following the advice of a senior colleague in his first years at UNC who had advised him to so arrange his desk for the reason that Professor Doe's original desk configuration did not face his computer screen towards the door, which sometimes can draw a negative comment on performance reviews for productivity reasons. Following the advice of this

---

[9] See, Procedures for Reporting and Responding to Complaints of Discrimination, Harassment, and Related Misconduct Involving a Student as a Reporting Party and a University Employee as a Responding Party § III (C)(1) (https://eoc.unc.edu/files/2015/05/Procedures_for_Reports_by_Students_Against_Employees1.pdf) (accessed July 10, 2018 12:23 PM).

[10] See, Policy on Prohibited Discrimination, Harassment and Related Misconduct Including Sexual and Gender-Based Harassment, Sexual Violence, Interpersonal Violence and Stalking, § VI (A) (effective and last revised 8/28/14) (https://unc.policystat.com/policy/4514917/latest/) (accessed July 10, 2018 at 11:41 AM).

colleague, Professor Doe had (many years ago and without complaint) rearranged his desks so his screen faced the door, with the unintended (and only once ever complained of) result that the remaining space in which to sit if you were a guest in Professor Doe's office felt "cramped" (to some).

45. That Professor Doe nonetheless followed the furniture arrangement advice of Defendant Kenneth T. Andrews and rearranged his office quarters to the effect that there were no further complaints from students ever communicated to Professor Doe until Jane Roe's May sexual harassment charges were brought so that she would not flunk out of the program.

46. That despite repeated warnings Jane Roe's performance never improved.

47. That at the end of the semester, on May 8, Professor Doe was obligated to enter Jane Roe's grade as "L" ("low pass").

48. That Professor Doe has only given two "L"s in his entire career at UNC.

49. That this poor grade—if it stood—would be the third such "L" grade and thus mean the immediate end of Jane Roe's academic career at UNC and the end of her lawful presence in the United States of America under her student visa.

50. That on May 8 as Professor Doe was preparing to travel to campus, he received a warning call from a concerned colleague who stated that Jane Roe was seen "wearing a fitted dress" and "wandering around, hovering, and waiting" for Professor Doe near his office.

51. That on May 8, the same day she received word of her "L" grade, Jane Roe bombarded Professor Doe with the following harassment:

     i.   An avalanche of emails and calls, even obtaining and using his private cell phone number without Professor Doe's permission.

     ii.  Insisting on an in-person meeting with Professor Doe against Professor Doe's objections, and showing up to said meeting dressed with uncharacteristic sexuality as noted by other colleagues.

     iii. Stalking Professor Doe across campus over his repeated explanations that there was nothing he would do to change her grade and nothing she could do to change it herself at this point.

     iv.  Initiating unwanted physical contact with Professor Doe over his objections and even clasping her arms around his torso begging him to reconsider, stating: "I'll do anything, please [Professor Doe] ... Do you want to be responsible for ... my life being ruined?" That Professor Doe had to verbally and physically repel and admonish Jane Roe.

-18-

v.   Continuing to follow Professor Doe into the parking garage and standing behind his car not allowing him to leave after he had ended the conversation and entered the privacy of his personal vehicle.

vi.   Claiming she had "lost her bearings" and pleading for Professor Doe to give her a ride back to the department.

vii.   In an effort to appease a clearly unstable person Professor Doe acquiesced to drop Jane Roe off near the department which was on his way out of campus, but after entering his car and riding the short distance to the drop off point, she then refused to get out of his car until Professor Doe—having repeated himself multiple times for her to leave his vehicle—finally resorted to raising his voice at Jane Roe to make her leave.

52. That Jane Roe has <u>admitted</u> the facts in the paragraph immediately preceding this paragraph.

53. That May 8, 2015 was a Friday.

54. That <u>the next business day</u> (Monday, May 11) Jane Roe met with then EOC Deputy Title IX Coordinator Ew Quimbaya-Winship to report Professor Doe's purported sexual harassment.

55. That on May 14 Jane Roe met with the Administrative Reviewer Laura DePersia ("Administrative Reviewer") and again requested that UNC formally investigate Professor Doe.

56. That UNC implements the "single investigator" model which has come under much criticism even from feminist legal scholars, as shown above.

57. That UNC implements an EOC investigation model that <u>denies</u> both parties a hearing at the investigation stage which has come under much criticism even from feminist legal scholars, as shown above.

58. That:
It is manifest that some kind of hearing is required at some time **<u>before</u> a person is finally deprived of his property interests** ... Man being what he is cannot safely be trusted with complete immunity from outward responsibility in depriving others of their rights. That a conclusion satisfies one's private conscience does not attest its reliability. **The validity of a conclusion largely depends on the mode by which it was reached** ... No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss **notice** of the case against him and opportunity to meet it. Nor has a better way been found for generating the feeling, so important to a popular government, that justice has been done.

-19-

*DeBruhl v. Mecklengurg County Sheriff's Office*, ___S.E.2d___ 2018 WL 1801628 (April 17, 2018) (citing *Wolf v. McDonnell*, 418 U.S. 539, 557-58 41 L. Ed. 2d 935, 952 (1974) and *Joint Anti-Fascist Refugee Committee*, 341 U.S. 123, 171-72, 95 L. Ed. 817, 854 (1951)) (emphasis added).

59. That the specific allegations by Jane Roe regarding Professor Doe's purported sexual assault of her during the vague and unspecific timespan of "fall of 2014 to March 19, 2015" were as follows:

     i.    That during closed door one-on-one meetings he would have Jane Roe sit next to him;

     ii.   That during closed door one-on-one meetings when Jane Roe would sit next to him, he on "at least" ten (10) occasions placed his hand on her inner thigh for ten (10) seconds "each time";

     iii.  That during closed door one-on-one meetings when Jane Roe would sit next to him he placed his hand on her shoulder for "several" seconds;

     iv.  That during closed door one-on-one meetings when Jane Roe would sit next to him he grabbed her hands and looked into her eyes; and

     v.   That he would write on assignments, "meet me in my office" or "I'm happy to meet with you," in order to lure Jane Roe to his office.

60. That the above vague and unspecific allegations gave Professor Doe no meaningful notice and thus no meaningful opportunity to prepare for his subsequent interview with the Administrative Reviewer and ultimate SGC appeal.

61. That, for good reason, <u>the above vague and unspecific allegations would not ever have been sufficient in an authentic tribunal</u> even under the low bar of notice pleading required through Federal and North Carolina Rules of Civil Procedure, which although not binding on administrative tribunals are nonetheless informative as to due process violations. *See*, North Carolina Rules of Civil Procedure, Rule 8(a)(1) (2018); *see also, Rink & Robinson, PLLC v. Catawba Valey Enterprises, LLC*, 220 N.C.App. 360, 366, 725 S.E.2d 426, 431 (2012).

62. That Jane Roe further alleged her failing grade was not her fault but was an elaborate retaliatory response by Professor Doe based on Jane Roe's artificial contention that Professor Doe believed that it had been Jane Roe (and none other) who had reported the close office quarters "issue" in March, 2015.

63. That at this May 14 meeting the Administrative Reviewer accepted witnesses from Jane Roe who Jane "believed could offer information about their similar, personal experiences with Dr. Perez."

64. That at subsequent meetings with Professor Doe the Administrative Reviewer would not accept character witnesses of Professor Doe.

65. That the EOC failed to follow its own rules and procedures (then in effect[11]) by failing to attempt ANY "informal" resolution whatsoever:

> PROCEDURES FOR REPORTING AND RESPONDING TO COMPLAINTS OF DISCRIMINATION, HARASSMENT, AND RELATED MISCONDUCT INVOLVING A STUDENT AS A REPORTING PARTY AND A UNIVERSITY EMPLOYEE AS A RESPONDING PARTY
>
> **To Implement the *Policy on Prohibited Discrimination, Harassment and Related Misconduct Including Sexual Violence, Interpersonal Violence and Stalking***
> …
>
> III.     Administrative Review Process
>
> The purpose of an Administrative Review, which will include interviewing the parties and witnesses, is to gather and assess the facts relevant to the complaint and to make recommendations to equitably address the concerns in order to resolve the complaint.
> …
>
> B.     Determination of Whether to Conduct an Administrative Review
>
>    1.     Administrative Review Deemed Appropriate
>
>       If the Complainant alleges conduct that appears to violate the Policy, the Equal Opportunity and Compliance Office will initiate an Administrative Review *if informal attempts at resolution have been unsuccessful.*
> …

(underlined emphasis added; other emphasis in original).

66. That to the extent Defendants will argue the March 24, 2015 meeting effectuated an "informal" attempt at resolution: (i) there was no EOC charge—none at least that Professor Doe received constitutional notice of—pending at that time, but most importantly (ii) the March 24, 2015 meeting was successful by all witnesses' accounts at having corrected (hence, resolved) the "cramped" office quarters (and thus physical "bumping") issues.

---

[11]Policy provisions from 2015 available at: https://eoc.unc.edu/files/2015/05/Procedures_for_Reports_by_Students_Against_Employees1.pdf (last viewed July 6 at 1:35 PM).

67. That on or about May 15 two senior level faculty members in the same department met to have lunch: Kathleen M. Harris ("Professor Harris") and Guang Guo ("Professor Guo").

68. That Professor Guo was the graduate advisor and sole recruiter for Jane Roe, thus biased in her favor to the extent that advisees' success is known and taken in the academic profession to be a reflection of their recruiter and advisor.

69. That, among other things, at the May 15 lunch:

    i.    Professor Guo expressed that Jane Roe had recently told him that Professor Doe had fist bumped the outside of her leg.

    ii.    That Professor Harris did not understand the issue.

    iii.    That Professor Guo stood up from his seat at the restaurant to better physically demonstrate a bump of the fist to the outer knee and convey to Professor Harris what Jane Roe had told him.

    iv.    That Professor Harris recalls this because she thought it so strange.

    v.    That Professor Guo expressly said the contact was "not sexual".

70. That the above recitation of 'what Jane told Guo' is the actual truth, though later Professor Guo would falsely state that Jane had actually told him a story involving inner thigh touching, but that such a claim is unbelievable or else self-incriminating for Professor Guo since as a "Responsible Employee" under UNC policies, Professor Guo would have been obligated to report such conduct, which he did not do.

71. That on May 19 (after filing the sexual harassment charges) Jane Roe brought a formal Grade Appeal challenging her failing Professor Doe's class on the basis that her grade was "arbitrary," "based on sexual harassment," "possible retaliation," and that Professor Doe used "questionable grading and criteria."

72. That an analysis of the claims in Jane Roe's appeal reveals that while ninety-seven percent (97%) of its allegations regard grading methodology, only three percent (3%) of its allegations are attributable to the purported sexual harassment.

73. That this sequencing of claims was intentionally orchestrated by Jane Roe to give her grade appeal the highest chance of success, i.e., that by alleging Professor Doe's purported sexual assault caused a hostile work environment it would be impossible for Jane Roe to be held accountable for in fact having simply maintained her academic trajectory of being a substandard, failing student. (As shown below, this was exactly the ultimate result: the Grade

Appeal Committee "found no evidence that the instructor deviated from grading requirements ... However ... [the Grade Appeal Committee] could not objectively determine the extent to which the cited harassment (as determined by the EOC) [sic] made it difficult to perform at a passing level in the course.")

74. That Jane Roe's Grade Appeal contained substantially false information, to wit:

    i.    That Jane Roe made at least fourteen (14) lies by commission, i.e., statements that were definitively refuted by existing records provided by Professor Doe in his (required) response to the Grade Appeal. For example, claims such as, "I got one of the highest scores on the exam," or "I have been a strong overall student;"

    ii.    That Jane Roe made at least nine (9) lies by omission, i.e., deliberately withheld pertinent information. For example, claims such as, "He never returned Homework 8" while failing to mention that there was no 'Homework 8,' and her claim that her absences should have been excused because she sent a request to the Teaching Assistant asking him to setup a video-conference for her, while omitting that she did so only sixty (60) seconds before class began;

    iii.    That Jane Roe made at least three (3) unsubstantiated claims, i.e., claims made without any supporting documentation other than her own wishful thinking. For example, claims such as, "[Professor Doe] was likely to know that I filed a harassment charge on [date]," or "[Professor Doe] tried to give me 100% on my participation score;" and

    iv.    That in approximately eighty-eight percent (88%) of her Grade Appeal claims she either contradicts the record or wantonly distorts it.

75. That on June 2 Professor Doe was notified of the pending charges and Grade Appeal and that ever since his notification of the pending charges he began keeping meticulous notes regarding meetings and conversations with anyone involved in his case.

76. That Professor Doe was interviewed on June 9 and June 10 by the Administrative Reviewer.

77. That between June 19 and June 30 Professor Doe met with the Administrative Reviewer several times to review her notes: (i) which he was made to do in her presence and with her watching; (ii) which he was not allowed to make copies of or have emailed to him for more reflective, sober review; and (iii) which review was rushed and he was encouraged to not take so long in reviewing his accuser's (and her witnesses') incriminating statements against him.

-23-

78. That nearing the conclusion of her investigation, on July 29 the Administrative Reviewer met again with Professor Doe a final time suggested to him in a condescending, pressuring tone, "It's OK, you can tell me."

79. That this July 29 meeting clearly evidenced that an improper evidentiary bias had formed in the Administrative Reviewer and that she was seeking to extract—whether truthful, voluntary, or otherwise—a confession of guilt from Professor Doe.

80. That Professor Doe was never given any opportunity to review the Administrative Reviewer's notes from this final meeting.

81. That on August 5 Professor Doe's first child was born from a difficult and dangerous pregnancy by Professor Doe's wife.

82. That Professor Doe's wife was then emergently hospitalized from August 9 through August 17 for post-delivery complications, during which time Professor Doe was at her side.

83. That despite this dramatic personal affair, Professor Doe was denied pleas he made to Defendant Kenneth T. Andrews for a course release (courses began August 18).

84. That on August 20 Defendant Kenneth T. Andrews sent a mysterious email "recapping" his meeting with Professor Doe on March 24 nearly half a year prior and mentioned <u>for the first time</u> that they had purportedly at that time spoke regarding his too-familiar "touching" of students.

85. That on August 24 the Administrative Reviewer published the EOC Report.

86. That the EOC report is a facile and unacceptable attempt at documentation in light of its redactions which make it a feat of sheer impossibility (to Jane Roe's favor) to critique or reevaluate the Administrative Reviewer's reasoning. For example, in section "IV" of the EOC Investigative Report by the Administrative Reviewer an entire multipage section reads as follows in full ("------" used to denote redaction):

IV. BACKGROUND INFORMATION

-----------------------------------------------------,--------------,------------
----------,----------,-----------------------. According to ---------, sometime before March 19, 2015,----learned from ---------and-------that they may have had unwanted and inappropriate interactions with [Professor Doe]. ------------------------------------------------------------
----------------------------reported that on or around March 18, 2015, --------spoke with-----------about [Professor Doe's] conduct, and---
------encouraged----to speak with------------------------------------------
------------------------------------------------------------------------------
According to----,------------met with------on March 20, 2015. Following his discussion with-------,-------spoke with [Professor

Doe] about the matter on March 24, 2015-------------------------------
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
------.

V. SUMMARY OF INTERVIEWS AND ALLEGATIONS

...

*EOC Report*, p.5-6 (August 14, 2015).

87. That the EOC report is no more helpful in understanding who was interviewed or for how long, as the interview log astonishingly reads as follows and <u>only</u> identifies Professor Doe ("------" used to denote redaction):

| Name | Title | Date of Interview |
|---|---|---|
| ------------------- | ----------------- | 5/14/15<br>5/15/15<br>7/02/15 |
| ------------------- | ----------------- | 5/26/15<br>7/28/15 |
| ------------------- | ----------------- | 6/02/15 |
| ------------------- | ----------------- | 6/02/15 |
| [Professor Doe] | Assistant Professor, Department of Sociology | 6/09/15<br>6/10/15<br>7/29/15 |
| ------------------- | ----------------- | 6/19/15 |
| ------------------- | ----------------- | 6/24/15 |
| ------------------- | ----------------- | 6/26/15 |
| ------------------- | ----------------- | 7/01/15 |
| ------------------- | ----------------- | 7/01/15 |
| ------------------- | ----------------- | 7/07/15 |
| ------------------- | ----------------- | 7/07/15<br>7/29/15 |
| ------------------- | ----------------- | 7/20/15 |
| ------------------- | ----------------- | 7/27/15 |
| ------------------- | ----------------- | 7/29/15 |
| ------------------- | ----------------- | 8/10/15 |
| ------------------- | ----------------- | 8/10/15 |
| ------------------- | ----------------- | 8/11/15 |
| ------------------- | ----------------- | n/a |
| ------------------- | ----------------- | n/a |
| ------------------- | ----------------- | n/a |
| ------------------- | ----------------- | n/a |

*EOC Report*, p.2-4 (August 14, 2015).

88. That the only conclusion which ought be drawn from the EOC Report's vague documentation of interviews (with unknown persons) is that Professor Doe's

-25-

contact with students described above in his cramped office quarters did make a few female students "uncomfortable" and "awkward" **but also that the very moment it was first brought to his attention by his March 24, 2015 meeting with Defendant Kenneth T. Andrews that all such "cramped office" issues abated immediately.**

89. That having cramped office quarters (at the advice of a senior colleague) which made a few students feel awkward and which was corrected immediately upon first notice is categorically distinguishable from the grievous allegation of sexual harassment of placing one's hand on another's inner thigh multiple (but no specific) time(s) on some (but no specific) date(s).

90. That having cramped office quarters (at the advice of a senior colleague) which made a few students feel awkward is not enough evidence to jump to the extraordinary evidentiary presumption that the grievous allegation of sexual harassment by placing one's hand on another's inner thigh multiple (but no specific) time(s) on some (but no specific) date(s) should be given a thumb—much less a fist—on the scales and taken flatly as true.

91. That nonetheless the EOC Report culminates in the following vacuous conclusion:

> [T]he Administrative Reviewer determines that the preponderance of the evidence (i.e. more likely than not), demonstrates that [Professor Doe] engaged in sexual harassment of [Jane Roe] as defined under the Policy ... [Professor Doe] denied ever touching [Jane Roe's] inner thigh, however, there is sufficient evidence to support a pattern of behavior and propensity by [Professor Doe] to engage in conduct with female students when working side-by-side with them, particularly physical contact of various degrees, which made them feel uncomfortable. **The evidence makes it more likely than not that [Jane Roe's] version of the events should be considered as true ...**

*EOC Report,* p.36-37 (emphasis addd).

92. The above excerpt shows improper, inadequate, insufficient, circular, and tautological adjudicative reasoning by the Administrative Reviewer that a reasonable, well-trained, and unbiased trier of fact in similar situations would not have so concluded, to wit, as to the inner thigh touching (which is the blood in the water of Jane Roe's allegations) the Administrative Reviewer essentially reasoned as follows:

    i.    Jane Roe (and no one else) accused Professor Doe of touching her inner thigh ten (10) times over a half year time period (no specific time or date given);

    ii.   Professor Doe denied ever touching her inner thigh;

iii. A few students found Professor Doe's office quarters cramped; thus

iv. Professor Doe must have touched Jane Roe's inner thigh less than ten (10) times, but at least once, on some (but no specific) date spanning half a year.

93. The EOC Report also concluded that Jane Roe's conduct towards Professor Doe on May 8 (which she admitted to doing) did not constitute stalking or harassment.

94. That on August 27 Professor Doe received a letter of reprimand from Dean Hartlyn as required by the EOC Investigator's recommendations which disturbingly used the precise language—verbatim, copied—from Defendant Kenneth T. Andrew's private email to Professor Doe one (1) week prior regarding the hind-sight addition to the March 24, 2015 meeting between Defendant Kenneth T. Andrews and Professor Doe that they had purportedly at that time discussed his office furniture arrangements and also physical touching of students, as follows:

> From Defendant Kenneth T. Andrews "recap" August 20 email: "Specifically, I encourage you to *maintain a professional distance between you and students when you meet with them (e.g., sitting on opposite sides of the desk), to have no physical contact beyond what is appropriate in a professional environment, and to keep your door open during meetings...*" (emphasis added).

> From Dean Hartlyn's August 27 letter of reprimand and in reference to the March 24, 2015 meeting: "**At that time** Prof. Andrews informed you of the need to *maintain a professional distance between you and students when you meet with them (e.g., sitting on opposite sides of the desk), to have no physical contact beyond what is appropriate in a professional environment, and to keep your door open during meetings...*" (emphasis added).

95. That Dean Hartlyn's verbatim copying of Defendant Kenneth T. Andrew's prior email to Professor Doe suggests a department and parent College acting in concert against Professor Doe, specifically in an effort to coordinate varying UNC officials' versions of the facts to most damage Professor Doe by making it falsely appear that he had already been reprimanded for physical touching of students prior to the EOC investigation.

96. That this coordination against Professor Doe artificially bolstered *nunc pro tunc* the credibility of Jane Roe's false allegations.

-27-

97. That in early October an appeal was filed with the Student Grievance Committee (SGC) by Jane Roe (upset Professor Doe was not fired or more strictly disciplined).

98. That on October 12 Professor Doe conducted his EOC training as required by the EOC Report, including a meeting with UNC's Senior EOC Compliance Consultant, Camille Brooks, for mandated one-on-one training. At this meeting Professor Doe offered a proposed hypothetical of the conduct Jane Roe committed against him on May 8 and asked Ms. Brooks if that would constitute harassment under the policy, to which she responded gregariously: "Oh *that* definitely sounds like harassment!"

99. That on October 29 Professor Doe met in his office with one of Jane Roe's key witnesses, referred to herein as "Jane's Friend" to respect her anonymity. Furthermore that if Jane's Friend's true identity is able to be inferred it is only because of overt and intentional acts Jane's Friend has taken above and beyond mere participation in being interviewed by the Administrative Reviewer and testifying at the SGC proceedings (said "above and beyond" actions are described more fully below).

100. That Jane's Friend was a highly capable graduate student and mentee of Professor Doe, having excelled in his courses and subsequently sought him out at length desiring to work under his renowned tutelage.

101. That in the course of the initial EOC Investigation Professor Doe had listed Jane's Friend as one of his own witnesses.

102. That at the October 29 office meeting Professor Doe spoke frankly with Jane's Friend and at length about his side of the case, his viewpoints, theories, etc. before Jane's Friend finally revealed to him, to his shock, that she had actually been one of the unidentifiable (due to the overly redacted EOC Report) witnesses who had ultimately testified largely in Jane Roe's favor.

103. That Professor Doe would not have shared such information with Jane's Friend had he been able to discern her identity from the overly redacted EOC Report, and that this highlights how such redactions biased the SGC appeal process (his ability to prepare) in Jane Roe's favor.

104. That at the October 29 meeting, after unveiling which side she was on (Jane Roe's) Jane's Friend broke down crying and confessed the following to Professor Doe (her former instructor and current supervisor):

    i. That she had been the victim of severe sexual harassment and sexual assault multiple times in the past;

    ii. That her past has left her with a "natural suspicion and distrust and distrust of men;"

-28-

iii. That she did not think Professor Doe's interactions with her were inappropriate at the time they occurred;

iv. That her bias about taking "gender issues" "seriously" was so strong that she would not hesitate to "start a war" over it;

v. That she never questioned her interactions with Professor Doe until after Jane Roe approached her in the summer of 2015;

vi. That being brought into the EOC investigation caused her former Post Traumatic Stress Disorder ("PTSD") to resurface for which she required therapy to treat <u>while</u> the EOC investigation was ongoing;

vii. That her PTSD was so bad in the summer of 2015 that <u>she told the Administrative Reviewer she would likely be an unreliable witness</u>;

viii. That her feelings that particular summer, her past PTSD, her commitment to show solidarity with Jane Roe, and self-described role as the department's champion on "gender issues" affected her testimony regarding (i) exaggerating the context and frequency of the limited physical contact of her shoulder by Professor Doe; and (ii) let her anger towards men and her sympathy towards a fellow woman peer affect how she described, in hindsight, her own perception of how she truly had perceived Professor Doe's physical contact;

ix. That she said to Professor Doe: "I told the [Administrative Reviewer] she shouldn't be talking to me. I had just had a breakdown, and would probably have interpreted any contact I had with any man, including you, in a negative light, even if it wasn't;"

x. That she was angry all of her past abusers had gotten away with it and never apologized for the harm they caused her and was thus, "tired of them [men] getting away with it;"

xi. That hours after initially telling the Administrative Reviewer that she had initially felt comforted and supported by Professor Doe, she "read about sexual harassment on the internet" and then emailed the Administrative Reviewer to reframe/re-clarify her memory of her interactions with Professor Doe as definitely not comforting or supportive, but instead as sexual harassment.

105. That Professor Doe—Jane's Friend's mentor, confidante, and current supervisor—told her he was terribly sorry for what had befallen her in life and that he would be honored to be the first male in her life to apologize for any discomfort she (retroactively decided she) felt.

106. That Jane's Friend would later characterize this statement by Professor Doe as an admission of guilt rather than an expression of

sympathy, but in the interim left his office visibly distraught from her confession.

107.     Again: **A key witness of the accuser announced herself as unreliable and emotionally compromised to the Administrative Reviewer, a fact egregiously omitted in the EOC Report.**

108.     That on November 2 the Grade Appeal Committee findings were summarized in a memorandum penned by Dean Hartlyn, stating in controlling part:

> [T]he Grade Appeal Committee found <u>no</u> evidence that the instructor deviated from grading requirements and descriptions provided on the syllabus, and concluded that the grades for the two assignments submitted were fair based on the Grade Appeal Committee's own assessment of the assignments. <u>However</u>, in its October 2015 findings, the Grade Appeal Committee wrote that it could not objectively determine the extent to which the cited [sexual] harassment (as determined by the EOC) made it difficult to perform at a passing level in the course. As a result, the Grade Appeal Committee recommended that [Jane Roe] be provided with an opportunity to take another version of this course, in order to learn the course material ... so long as it is not taught by the instructor involved in [the EOC investigation, i.e., Professor Doe].

109.     That an affidavit is available upon request penned by a member of the Grade Appeal Committee which sharply elucidates the manner in which the Grade Appeal Committee was infected by EOC pressures, as well as the honesty with which Professor Doe herein is required to state that Jane Roe was simply a substandard student.

110.     That on November 13 Jane's Friend made good on her statement to "start a war" to take "gender issues" "seriously" by initiating one of her first objective defamatory acts in holding a "town hall" meeting between herself, Defendant Andrews, and multiple members of the EOC, including then-director Jayne Grandes. Furthermore, that the purpose of this meeting was to openly discuss the "problem" of Professor Doe remaining on campus and exposed to students.

111.     That present at this meeting were multiple individuals not privileged under UNC policy as "need to know" persons yet to whom Jane's Friend intentionally disclosed confidential and defamatorily misleading information.

112.     That an EOC administrator present at the "town hall" (Jayne Grandes) would subsequently deny—falsely—her presence at this meeting when prompted by Professor Doe.

113.     That this "town hall" meeting was only the first of what would be multiple meetings arranged by Jane's Friend with other administrators, graduate students at large, and graduate student leadership at UNC which were improperly used to defame, destroy, sabotage, and tortuously interfere with the employment contract of her former mentor, Professor Doe.

114.     That, in the wake of the EOC Report and "the war" at UNC being waged by Jane's Friend, on November 17 Defendant Andrews summoned Professor Doe for a meeting where, among other things, he stated to Professor Doe in regards to the sexual harassment charges and UNC's hands-tied response, that:

    i.     "[Professor Doe], it isn't about what you did or didn't do at this point. It's about perception, and what these students are willing to do, not just to you but to the department, even me.";

    ii.     That Jane's Friend and Jane Roe might go to *The News and Observer* if this is not resolved as they wish; and

    iii.     That Jane's Friend and Jane Roe had threatened Defendant Kenneth T. Andrews if he did not "do something" about Professor Doe.

115.     That on November 20 Professor Doe met with UNC's ombudsmen, Wayne Blair, who expressed grave concern at the circumstances and advised Professor Doe against trusting Defendant Kenneth T. Andrews or Dean Hartlyn, based on their actions in the case to date.

116.     That Wayne Blair strongly recommended Professor Doe submit to a polygraph (lie detector) test.

117.     That a member of the Chapel Hill Police Department also recommended Professor Doe submit to a polygraph (lie detector) test.

118.     That at great expense and on the advice of Wayne Blair and the Chapel Hill Police Department on December 1 Professor Doe submitted to a polygraph examination.

119.     That although polygraph questions and results are inadmissible under the North Carolina Rules of Evidence:

    i.     The Rules of Evidence do not apply in Title IX hearings; and

    ii.     That the following is admissible even in real courts: (a) the mere fact that a person submitted to a polygraph, (b) the mere fact that such person requested to have their results admitted into evidence, even before seeing the results, and (c) what the polygraph tester opined.

120.     That over emails between November 30 and December 1 Professor Doe requested of the SGC Chair, Robert Joyce, that his upcoming polygraph

results be admitted into evidence, but that Chairman Joyce flatly refused to allow any polygraph evidence whatsoever.

121.     That on December 9 the first SGC hearing was conducted as follows:

    i.     <u>That Jane Roe only had two (2) of her ten (10) listed witnesses appear.</u>

    ii.     **That Professor Doe had over twenty-four (24) witnesses appear in his favor, so much so that an overflow room was needed.**

    iii.     That Professor Doe was only allowed time for four (4) of his witnesses to testify.

    iv.     That some of these witnesses were ones that the Administrative Reviewer had impermissibly failed to contact when drafting the EOC Report.

    v.     That Professor Doe's witnesses were: three students who had worked extensively with him in his office up to hundreds of hours in the aggregate (two female, one male) and one (female) tenured faculty member.

    vi.     That Professor Doe's witnesses variously testified: (i) that the Administrative Reviewer who compiled the EOC Report failed to adequately establish contact with some of them and as such their testimony was not considered in the initial EOC Report; and (ii) that they had experienced the same incidental "bumping" contact described by some of the witnesses <u>yet</u> always felt it completely appropriate, friendly, and non-sexual (even when alone with Professor Doe).

    vii.     That the tenured faculty witness was Professor Harris (introduced in this Complaint above) who testified as to: (i) her meeting on or about May 15, 2015 with Professor Guo wherein the physical contact described *and demonstrated twice* to her by Professor Guo recounting what Jane Roe had told him was nothing more than an outer knee bump in an encouraging fashion; and (ii) Jane Roe's incredibly poor academic standing and character credibility within the department.

122.     That on December 17 the second SGC hearing was conducted as follows:

    i.     That Jane Roe's lawyer called Professor Guo as a rebuttal witness who testified that: (a) that Jane Roe was his "dream student" who he was elated to have secured the recruitment of to UNC; (b) that—knowing fully Jane Roe's profoundly checkered academic past—she was "a good student"; and (c) that he "did not recall" Professor Harris' version of the May 15 lunch, and that instead he recalled having told and demonstrated to Professor Harris an inner thigh touching.

-32-

123.    That Professor Guo's testimony at the second SGC hearing is the one (1) and only corroboration of Jane Roe's inner thigh touching allegation in all of the UNC records.

124.    That although the EOC Report is generally impossible for the non-clairvoyant to decipher, the SGC (who had in their possession an un-redacted copy of the EOC Report) answered the following question as follows:

    i.    **Professor Doe**: "Was Professor Guo the individual referred to in footnote number 32 of the [EOC Report]?"

    ii.    **SGC Panel**: [Confers with UNC General Counsel] "Yes."

125.    That footnote 32 of the redacted EOC Report reads in its—redacted—entirety as follows (describing the then-unnamed interviewee): "[32] At times, ------ was generally unclear on the sequences of events and the exchange of information and often did not speak confidently.-------------------------------------------- ----------------------------------------------------------------------------------------------------------- ----------------"

126.    That considered together the problem is that Professor Guo was <u>noted</u> (in an EOC Report that noted very little) as being unreliable, yet his testimony was the <u>sole</u> corroborating testimony (and hearsay testimony at that).

127.    That given: (i) Jane Roe alleged the inner thigh touching, (ii) Professor Doe denied the inner thigh touching, (iii) Professor Guo (who did not testify or interview with credibility) supported Jane Roe's testimony, and (iv) Professor Harris supported Professor Doe's testimony—**a preponderance of the evidence <u>could not possibly have been</u> in Jane Roe's favor.**

128.    That Jane Roe herself testified that she did not characterize her interactions with Professor Doe as sexual Harassment initially, but only later gradually came to interpret them as such.

129.    In addition to having zero corroborating witnesses with even remotely similar "inner thigh" touching, the preceding allegation that the burden of proof was not met is made even more plausible in light of the many other pieces of objective evidence which were before[12] the SGC, to wit:

    i.    Jane Roe's motive for lying: failing out of the graduate program and likely being deported;

    ii.    Jane Roe's credibility and propensity for truth telling: academic dishonesty in the form of self-plagiarism by turning in the same paper

---

[12] Obviously not before the SGC were Jane Roe's future acts at UNC: Jane Roe has recently been caught plagiarizing—again—on her comprehensive graduate exams taken in 2017.

in multiple classes at UNC, omissions and misstatements in her Grade Appeal, and the ever shifting "number" of times which the inner thigh touching purportedly occurred (something the EOC Report also noted);

iii.   The glaringly suspicious timing of Jane Roe not filing her claim until seven (7) weeks after the harassment was alleged to have stopped—mid-March, since after the late-March meeting with Defendant Kenneth T. Andrews it had become common knowledge that Professor Doe had rearranged his office and now kept the door wide open when he had learned that even just a few had "felt awkward" about the furniture—but only one (1) business day after she received her fatal "L" grade.[13]

iv.    A complete lack of any objective evidence against Professor Doe's credibility of propensity for truth telling.

130.   That at both SGC hearing dates UNC—the same "UNC" being federally investigated for not prosecuting Title IX cases strongly enough—General Counsel was present and conferred with the SGC in private and with great frequency.

131.   **That Professor Doe's counsel has requested and been _denied_ the audio recordings from UNC General Counsel of the SGC hearings under a claimed privacy defense of the audio recordings amounting to an "education record" under FERPA.**

132.   That UNC General Counsel has promised to deliver a redacted transcript of the SGC hearings but at the time of compiling this Complaint Professor Doe's counsel is without said promised transcript.

133.   That on January 12, 2016 the SGC released its Notice of Hearing Outcome (the "SGC opinion") affirming and restating the EOC Investigate Report's central finding that sexual harassment had affirmatively occurred.

134.   That the SGC opinion made the following stunningly inadequate and constitutionally insufficient finding of fact/conclusion:

Specifically, the Hearing Panel concluded that the Respondent engaged in unwelcome physical conduct based on sex that created a hostile, intimidating, or abusive environment for the Grievant. The Hearing Panel determined that the Respondent placed his hand on the Grievant's thigh while they were alone in his office on more than one occasion. _Although the Hearing_

---

[13] I.e., the real reason Jane Roe alleged the sexual harassment was solely to bolster her Grade Appeal, but it would have simply been too implausible to allege that harassment occurred in Professor Doe's office after the late-March meeting (of which she knew) and after which it was common knowledge that Professor Doe's door was thereafter constantly open.

Panel did not conclude that a preponderance of the evidence showed that such conduct occurred with the frequency and duration alleged by the Grievant, the Hearing Panel found that the conduct was sufficiently severe and pervasive that it altered the conditions of the Grievant's education, thereby creating an environment that a reasonable person in similar circumstances and with similar identities would find hostile, intimidating, or abusive.

135.    That the above excerpt from the SGC opinion clearly makes no finding that the evidence was sufficient to prove any single actual date or time of day of an offense, but rather that "such conduct occurred" (in reference to Jane Roe's allegations) at some time (not a specific number of times) between "the fall" of 2014 and March 19, 2015.

136.    That the SGC opinion recited no specific date or time of sexual assault because no evidence of any single actual date was ever presented to the SGC or requested by the SGC. Furthermore, that no evidence of an actual date or time was offered into evidence because the alleged sexual assault never occurred.

137.    That the only rational item which may be deduced from the SGC finding/conclusion is that the SGC clearly found Jane Roe's allegation as to the number of occurrences unbelievable.

138.    That the awesome and controlling inadequacy of this issue requires its emphasized restatement: Professor Doe had his tenure-track career, professional reputation, and personal reputation obliterated by the SGC's rubber stamping the EOC Report's conclusion based on an allegation of sexual harassment:

  i.    Where No date or time of offense was ever alleged;

  ii.   Where No date or time of offense was ever proven;

  iii.  Where No date or time of offense was ever inquired of; thus

  iv.   Where No date or time of offense was (or even could have been) made a finding of fact by the convicting tribunal; thus

  v.    Where The only testimony about "inner thigh" touching against Professor Doe came from (1) his accuser who stood to gain enormously from succeeding, and (2) her mentor's hearsay which was noted as unreliable and was contradicted by other credible testimony of Professor Harris.

139.    As outraged as Professor Doe was by the SGC opinion, he at this point began to believe what he had been told by UNC through its multiple agents, employees, and administrators:

i. That it was clearly not in his best interest to appeal an EOC finding of sexual assault.

ii. That the likelihood of getting a fair trial clearly was lessened at each level.

iii. That appealing clearly would only risk his career further.

iv. That "at least the reprimand did not include" suspension or termination, only increased EOC training.

140. That the following reasons show (<u>beyond mere prediction or anticipation</u>) that exhausting further administrative remedies would have been futile and inadequate and as such Professor Doe resigned to not appeal further and to do his best to simply live with the SGC ruling and attempt to begin rebuilding his reputation and career prospects at UNC, the place he "loved and believed in," to wit:

i. His reliance on UNC's written representations that it would only exact on Professor Doe the reprimand which the SGC opinion had prescribed (increased EOC trainings)

ii. The mounting antagonistic pressures from his supervisor and department head;

iii. The intensifying campus atmosphere of "war" on "gender issues" that was, in part, directly aimed at him personally;

iv. The chilling pressure to not appeal in a futile and inadequate system;

v. The ongoing investigation of UNC's EOC office for Title IX compliance by the Department of Education Office for Civil Rights as announced in their May 1, 2014 press release[14]; and

vi. The increasingly zealous prosecution of Title IX claims in 2015, as would be later noted in a 2016 article reporting on the 2014 to 2015 year's success at having increased "formal investigations" by fifty-two percent (52%) from the 2013 to 2014 year, as a direct result of "expansive efforts" to, among other things, maintain and increase "students' willingness to report in the future."[15]

**Part II**

---

[14]https://www.ed.gov/news/press-releases/us-department-education-releases-list-higher-education-institutions-open-title-i (accessed July 6, 2018 at 3:25 PM).
[15] https://ontherecord.unc.edu/2016/10/title-ix-records-request-carolina-responds/ (accessed July 6, 2018 at 3:31 PM).

**(Facts from January 12, 2016 to the Present)**

141.     That in excess of the SGC reprimands:

    i.    By March of 2016 Professor Doe had been stripped of all graduate courses he was teaching, with direct or indirect reference to "pressure" from Jane Roe and Jane's Friend and UNC campus "perception."

    ii.    By the fall of 2016 Professor Doe had been removed from comprehensive exam committee work, with direct or indirect reference to "pressure" from Jane Roe and Jane's Friend and UNC campus "perception."

    iii.    By the spring of 2017 Professor Doe received word that he was "not allowed" to meet with prospective graduate students, with direct reference to "pressure" from Jane Roe and Jane's Friend and UNC campus "perception."

142.     That ever since the January 12, 2016 SGC opinion, Jane's Friend and Jane Roe each actively discussed the EOC investigation and resulting SGC opinion with: (1) current UNC students, (2) prospective UNC students, (3) UNC staff, (4) UNC faculty, and (5) UNC General Counsel. Furthermore that this allegation is substantiated by UNC faculty members who are ready and willing to testify on Professor Doe's behalf that the foregoing listed populations (except UNC general counsel) have all reported being part of such discussions initiated by Jane Roe and Jane's Friend in the timeframe alleged.

143.     That one such conversation between Jane Roe and a UNC faculty member occurred in February of 2016 wherein Jane Roe confronted said faculty member, saying, "Are you aware that you have a known sexual harasser in [this place]?" Furthermore that Jane Roe in this meeting expressly requested Professor Doe be expelled from a particular UNC institution and lose research funding as a result.

144.     That when a tenured UNC faculty member attempted to stand up in solidarity with Professor Doe that their efforts were unconstitutionally subverted, discouraged, and curtailed in violation of their rights to exercise free speech under the First Amendment; specifically:

    i.    That when Professor Doe was removed from a particular comprehensive exam at the direct pressuring and request of Jane's Friend that another tenured faculty member on the exam panel requested to step down with him.

    ii.    That this tenured faculty member was not allowed to step down by Defendant Kenneth T. Andrews in an email that stated: "...I spoke with the EOC director and Jonathan Hartlyn about this and have spent a great deal of time thinking about it further. I believe

changing the committee at this point is a bad idea and has the potential to create more problem [sic] than it solves. It would draw more faculty into the situation in a way that would be polarizing, and it could easily be misinterpreted by students. Changing at this point would be difficult, in part, because EOC and I have already communicated the plan to the student after we discussed it several weeks ago ..."

145.     That the preceding allegation shows precisely the sort of "pressure" and "perception" issues that UNC clearly elevated on a pedestal above the Truth, and that in this case they would not even let a tenured faculty member publicly show their support and compassion in opposition to the farcical charade which was continuing to devastate Professor Doe far beyond the EOC/SGC reprimand.

146.     That removing Professor Doe from the exam committee only metastasized matters and placated students in the name of "pressure" and "perception," as in fact: (i) exam grading is done anonymously, and (ii) the EOC Report and SGC had expressly found that Professor Doe had not engaged in grade retaliation against the complaining student, and an independent Grade Appeal Committee determined that Professor Doe's standards were more than fair.

147.     That UNC general counsel has volunteered to Professor Doe's attorneys that "UNC is really under a lot of pressure from these graduate students."

148.     That other graduate students who support Professor Doe have recently confided concerns to departmental faculty that Jane Roe and Jane's Friend continue to wrongly defame Professor Doe.

149.     That further acts of Jane Roe and Jane's Friend's defamation and breach of confidentiality include, but are not limited to:

   i.     In August of 2016 saying at a department lunch and in public that the department was "housing" a known sexual harasser, going on to name Professor Doe and suggest that he be "avoided" and suggesting that others "spread the word" about Professor Doe;

   ii.    In the late fall of 2016 that a few students who had been successfully swayed by Jane Roe and Jane's Friend slander of Professor Doe did approach their advisors "demanding answers" as to why Professor Doe was "still" employed. Furthermore that these advisors requested meetings with Defendant Kenneth T. Andrews to resolve their alarm at the students' aggressive poise and asking how they could functionally support Professor Doe whose innocence they maintained and yet were told there was "little they could do" and that "it would be best...not to say too much" about the case.

iii.   That March, 2017 recruitment efforts involved a dinner with prospective students at which Jane's Friend was in attendance and publicly announced to the prospective students that the department "has a sexual harasser" and identified Professor Doe by name and referred to the issue as a "huge problem."

iv.   That in the later spring of 2017 during a graduate school function the topic of race came up to which Jane's Friend publicly quipped, "race [was] not the only problem at the department as there [was] clearly a problem with any department that would <u>continue to employ</u> a known sexual harasser." Furthermore that this statement was made in the direct presence and attention of Defendant Kenneth T. Andrews who did nothing to correct, curtail, or abate the defamatory commentary.

v.   That in the fall of 2017 a graduate student confided that Jane's Friend had "told everyone" in the spring "about Professor Doe."

vi.   That in December, 2017 Jane's Friend's efforts were so successful that an unrelated graduate student who will remain unnamed circulated a department wide survey about sexual harassment in the department, which email began with the acclamation, "<u>I know that sexual harassment has been an issue in this department...</u>" when such information should have been confidential.

150.   That the conduct of Jane's Friend and Jane Roe was both:

i.   Publication of confidential information in breach of UNC's Policy on Prohibited Discrimination, Harassment and Related Misconduct Including Sexual and Gender-Based Harassment, Sexual Violence, Interpersonal Violence and Stalking policy guarantees that information "related to a report ... will only be shared with those University employees who 'need to know' in order to assist in the active review, investigation, or resolution of the report. While not bound by confidentiality, these individuals will be discreet and respect the privacy of all individuals involved in the process;" and

ii.   Publication of untrue information harmful to individuals other than Professor Doe and without his permission that he had committed sexual harassment when they both knew or should have known such statements were false, insofar as (i) Jane Roe knows she fabricated her claims against Professor Doe, and (ii) Jane's Friend herself reported to the Administrative Reviewer that she was unreliable given her past abuse, and until improperly influenced by Jane Roe's false accusations had held Professor Doe in high esteem as evidenced by seeking continuing work with him.

151.   That the conduct of Jane's Friend and Jane Roe was a voluntary waiver of any confidentiality rights which may have existed under FERPA and that if they raise such a defense they should be equitably estopped.

-39-

152.    That Jane's Friend and Jane Roe each:

    i.    Knew of the valid contract for employment existing between Professor Doe and UNC.

    ii.    Intentionally took steps to actively induce, persuade, and pressure UNC to not perform the contract for Professor Doe's employment.

    iii.    Acted without justification, insofar as Jane Roe knew (a) she had fabricated the underlying claims against Professor Doe, (b) Jane's Friend has admitted she was an unreliable witness given her past abuse, and (c) Jane's Friend had held Professor Doe in high esteem until Jane Roe solicited Jane's Friend to join the Title IX action against him.

153.    That Professor Doe suffered actual damage as a result of Jane's Friend and Jane Roe's conduct (above described) in the form of being constructively discharged by having his work environment made intolerable given his loss of all graduate teaching privileges, committee work, and access to collaborate with incoming students as a direct and proximate result of Jane's Friend and Jane Roe's efforts.

154.    That at all relevant and material times to this action Jane Roe and Jane's Friend have each been agents and/or employees of UNC as teaching assistants, research assistants, graduate student instructors, or otherwise.

155.    That at all relevant and material times UNC through its agents, employees, and/or administrators knew of the activities of Jane Roe and Jane's Friend and either encouraged them, ratified them, or else failed to take steps to affirmatively curtail them despite knowing (or being unrelieved from the responsibility of knowing) that their activities were far in excess of the reprimands issued by the SGC and were being conducted in a manner that violated UNC's purported promise to Title IX participants of confidentiality.

156.    That if Defendants feel Jane Roe and Jane's Friend are additional real parties in interest then they (Defendants) are free to move this Court to join or implead the two graduate students under Article 4 of the North Carolina Rules of Civil Procedure.

157.    **That on June 25 the Office for Civil Rights of the Department of Education released their** Letter of Findings[16] **regarding the high profile federal lawsuit pending against UNC since 2013 alleging that UNC was not seriously prosecuting Title IX claims, and that said letter found,** *inter alia*, **as follows:**

---

[16] Available at: https://www.unc.edu/wp-content/uploads/2018/06/FINAL-R-LOF-UNC-Chapel-Hill-11132051-PDF.pdf (accessed on July 10, 2018 at 1:28 PM).

i.  That the policy and procedures fail to specific whether notice will be provided to either party regarding any further review or appeal to the Board of Trustees or the Board of Governors;

ii.  That the policy and procedures do not explain or differentiate between the grievance processes;

iii.  That the policy and procedures lack specificity regarding the provision that the EOC will initiate a review if <u>informal</u> attempts at resolution have been unsuccessful;

iv.  That the policy and procedures fail to address what the <u>informal</u> process entails or whether the informal process is required prior to moving forward with an investigative process;

v.  That the policy and procedures do not specify that written notice of the outcome will be provided to both parties;

vi.  That the policy and procedures only provide an opportunity to appeal for one party, which is not equitable;

vii.  That some University staff members were not adequately trained to implement its own procedures;

viii.  That the University's own records from that time period suggest improper action, or inaction, by University staff at different levels of the complaint process; and

ix.  That the University's inadequate recordkeeping made it difficult to determine the extent of any noncompliance during the period of review.

158.  That this negative publicity against UNC only further shows what immense and constant pressures they were under since 2013 as well as continue to be under, as this case has received public, published news attention in no fewer than the following twenty-three (23) news corporations (often in a negative, pro-victim, 'more needs to be done' manner): *USA Today, The News & Observer, ABC News, The Wall Street Journal, ESPN, CBS, The Daily Tarheel, Insider Higher Ed, Campus Safety Magazine, WUNC, WRAL, Spectrum News, Reason Foundation, WNCT, The Knoxville News Sentinel, Truthout, The Triad Business Journal, WTVD-TV, The Denver Post, The Durham Herald Sun, Richmond County Daily Journal, The College Fix,* and *The Herald Sun.*

159.  That it is in response exactly these sorts of pressures the above-cited four-member, female, feminist Harvard law professor cohort penned the admonishing and accurate description that, "Terrified, administrators not only complied; they over-complied."

160. That on June 26, 2018 Carol Folt, in her capacity as Chancellor of UNC stated in her concluding remarks (regarding the closing of the Department of Education's Office of Civil Rights' investigation of UNC's EOC office): **"Nothing is more important to us than creating a culture at Carolina where _every_ member of our campus community feels safe, supported and respected. While this concludes the OCR investigation, it does not conclude our commitment."[17]**

161. That, ironically, just four (4) days later, on June 30, 2018 having been stripped of all work but undergraduate courses taught usually by non-tenure track instructors and even some graduate students, Professor Doe had no rational choice but to submit a letter of resignation in acknowledgment that his employment had already effectively been terminated, which included the following explanation:

> … It has been a difficult year as you [Defendant Andrews] are aware, and though I have always wanted to earn tenure in Sociology, the current climate and fallout from these administrative procedures [EOC/SGC] have severely compromised my ability to function, much less thrive, in the department. …

162. That contrary to Chancellor Folt's gilded promise, UNC ultimately neither supported nor respected Professor Doe, a once proud and committed community member who had always believed in UNC's "commitment" to "every" member of its community.

## ANONYMITY OF PLAINTIFF

163. That all preceding paragraphs are specifically incorporated by reference and are specifically re-alleged as though laid out in full herein.

164. Plaintiff's need for anonymity is sufficiently critical and deserved as a matter of equity and law because this case involves:

  i. Matters of a sensitive and highly personal and private nature (the inaccurate and misleading defamatory allegations of sexual harassment).

  ii. Matters including gender-based discrimination claims.

---

[17] https://www.unc.edu/posts/2018/06/26/campus-email-on-carolinas-title-ix-program/ (accessed July 6, 3:37 PM).

iii.   The risk of retaliatory harm to Plaintiff including but not limited to further and increased defamation, retaliation, and continued tortious interference with (future employment) contract by Defendants, their agents, employees, and administrators.

iv.   The risk of harm to non-parties, namely Jane Roe and Jane's Friend who would be much more easily identified if Professor Doe's identity is revealed.

v.   That the action is against government parties.

vi.   A low risk of unfairness to the opposing party in allowing this action to proceed with Plaintiff's anonymity intact, especially since Plaintiff's exact identify is known to Defendants.

*See, e.g., James v. Jacobson,* 6 F.3d 233, 238-239 (4th Cir. 1993); *see also,* Jayne S. Ressler, *Privacy, Plaintiff, and Pseudonyms,* 53 U. Kan. L. Rev. 195, 219 (2004-2005) ("Thus, as the Fourth Circuit so succinctly explained [in *Jacobson*], the public loses nothing when a plaintiff is allowed to proceed pseudonymously but all the other facts and circumstances of the case remain in view. As a result, public confidence in the judicial system need not suffer by the use of plaintiff pseudonymity.").

## FIRST CLAIM FOR RELIEF
### (Title IX Violation for Gender Discrimination)

165.   That all preceding paragraphs are specifically incorporated by reference and are specifically re-alleged as though laid out in full herein.

166.   That UNC receives federal funding, including in the form of federal student loans given to students.

167.   Because it receives federal funding, UNC is subject to the requirements of Title IX.

168.   Title IX prohibits gender discrimination in the education and education workplace settings.

169.   That as an employee of UNC Professor Doe was entitled to Title IX protections of being kept free from gender discrimination.

170.   That Jane Roe had no witnesses who independently corroborated her "inner thigh" allegations.

171.   That Jane Roe had very few witnesses to give cognizable credibility to her other claims.

-43-

172.   That Jane Roe's most credible witness (due to the Administrative Reviewer's flawed EOC Report which did not in any way mention any of the litany of credibility limitations) appeared to be Jane's Friend.

173.   That Jane's Friend subsequent statements in her confession Professor Doe (articulated at length above) clearly show an overt, unmistakable bias against men whom she harbors a "natural suspicion and distrust" of in sexual harassment charges which she disclosed to the Administrative Reviewer to no avail.

174.   **That Jane's Friend's bias <u>cannot</u> be re-characterized as "pro-victim"** because (i) it is obviously and invidiously an impermissible gender bias which far exceeded mere "pro-victim" sentiments in being focused on her "natural suspicion and distrust of men," and because (ii) her gender bias against men is "overwhelmed" by <u>no</u> obvious alternative explanation. *See e.g., Doe v. Univ. of Co.*, 255 F.Supp.3d 1064, 1074-79 (D. Colo. 2017) (discussing the same and citing, in part, *Ashcroft v. Iqbal*, 556 U.S. 662, 628 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

175.   That Jane's Friend's testimony—incorporated anonymously and without proper explanation of her biases in the EOC Report—unconstitutionally subjected Professor Doe to extreme gender bias for being a male accused of sexual harassment.

176.   That Jane's Friend's testimony—incorporated anonymously and without proper explanation of her biases at the SGC hearings and Notice of Hearing Outcome—unconstitutionally subjected Professor Doe to extreme gender bias for being a male accused of sexual harassment.

177.   That but for Jane's Friend's testimony at both levels of his "trial" at UNC, Jane Roe's allegations would have likely not appeared as credible.

178.   That the foregoing shows indirectly and inferentially that the Administrative Reviewer was equally or similarly biased against men such as Professor Doe accused of sexual assault as evidenced by her failure to mention these known and disclosed limitations of Jane's Friend's testimony.

179.   That during Professor Doe's "trial" and its two year aftermath in which he was stripped of all responsibilities, rights, and privileges as faculty member, that UNC was under immense pressure to be biased against men accused of sexual harassment in light of the campus-wide pressure, statements by the UNC administration, the ongoing Department of Education investigation against UNC's EOC office, and the national news coverage of the same.

180.   That because of the above impermissible gender biases which far exceeded mere "pro-victim" sentiments, The Board of Governors of the

University of North Carolina, UNC, and Carol Folt in her official capacity as Chancellor of UNC violated Professor Doe's rights under Title IX.

## SECOND CLAIM FOR RELIEF
### (Procedural Due Process Violation)

181.    That all preceding paragraphs are specifically incorporated by reference and are specifically re-alleged as though laid out in full herein.

182.    That the Fourteenth Amendment to Constitution of the United States reads, "No state shall ... deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.

183.    That the Fourteenth Amendment not providing a direct cause of action, its violations must be brought pursuant to 42 U.S.C. § 1983, which Professor Doe hereby does.

184.    That Article I, Section 19 of the North Carolina State Constitution's Declaration of Rights reads, "No person shall be ... deprived of his life, liberty, or property, but by the law of the land.  No person shall be denied the equal protection of the laws[.]" N.C. Const. art I. § 19.

185.    That Professor Doe has a property interest in his continued contractual employment and pending tenure-review.

186.    That Professor Doe has a liberty interest because his good name, reputation, honor, and integrity which are at stake because of what the government through its State actor has done and is doing to him.

187.    That Professor Doe was subjected to the obviously stigmatic statement of the spurious sexual harassment allegations, EOC Report, and SGC Notice of Hearing Outcome in 2015 and 2016, respectively, as set forth in detail above.

188.    That Professor Doe was subjected to the State action of his constructive discharge from January 12, 2016 to June 30, 2018 in excess of the EOC/SGC reprimands.

189.    That the stigmatic statements and State action have foreclosed, impaired, and irreparably harmed future employment opportunities for Professor Doe.

190.    That multiple federal courts have recently held that the possibility that a disciplinary violation will interfere with later opportunities for employment is so clear as to almost be a truism.

191.     That the effects of the stigmatizing statements and State action have altered and extinguished Professor Doe's legal status in constructively discharging him with a devastating black mark in his personnel file.

192.     That the effects of the stigmatizing statements and State action will likely alter and preemptively extinguish Professor Doe's current and/or future legal status yet further still, since his personnel file's confidential disciplinary actions can be released to potential employers (under N.C. Gen. Stat. § 126-24) at the discretion of the very department head (Defendant Kenneth T. Andrews) who has over and again taken, participated in, or ratified antagonistic, tortious, and unconstitutional actions against Professor Doe and by his own acts appears to harbor more care for Praise than for Truth, having already capitulated on numerous occasions to pressures from UNC to facilitate making Professor Doe an outcast and to constructively terminate his employment.

193.     That purported Title IX violations levied at the innocently accused which "smack of deliberate fraud and in effect allege dishonesty" can give rise to a constitutional claim.

194.     That, like other litigants recently trampled in the 'tough on Title IX' atmosphere, if Professor Doe seeks employment (as he had done, is doing, and must continue to do) with institutions or organizations that require disclosure of his disciplinary records (as many do) his *only option* is to forgo opportunities with those institutions or organizations, or else to authorize the dissemination of records which *would likely foreclose Professor Doe's ability to pursue such opportunities* because of the defamatory nature of the records.

195.     That in violation of Professor Doe's state and federal constitutional right to procedural due process The Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity as Chancellor through their agents, employees, and/or administrators: (i) acted in an arbitrary and capricious manner, (ii) involving substantially false information, (iii) lacking a disinterested tribunal, (iv) substantially departing from academic norms, (v) giving only perfunctory explanations for findings of fact and conclusions of law, and (vi) failing to give Professor Doe adequate notice of the charges against him thus inhibiting his ability to prepare a meaningful defense, insofar as these Defendants, by and through their agents, employees, and administrators, to wit:

    i.     Failed, through its EOC office and Administrative Reviewer, to attempt any informal resolution of the dispute, thereby breaching UNC policy;

    ii.    Failed to implement a system other than the single-interviewer model;

    iii.   Failed to allow Professor Doe to copy the Administrative Reviewer's notes;

iv.   Failed to allow Professor Doe to even review the Administrative Reviewer's notes resulting from their final meeting;

v.    Failed to allow Professor Doe to know the witnesses' identities in the Administrative Reviewer's investigation;

vi.   Failed, through its Administrative Reviewer, to discover (or having discovered, failed to disclose) Jane's Friend's extreme gender bias against men accused of sexual harassment (because such information would be easily discovered from a witness adequately interviewed);

vii.  Failed, through its Administrative Reviewer, to adequately contact several of Professor Doe's witnesses whose contact information was provided to the Administrative Reviewer;

viii. Failed, through its Administrative Reviewer, to interview Professor Doe without palpable bias and a presumption of guilt;

ix.   Failed, through its EOC office, employees, and administrators to implement policies and procedures which provide for that hallowed hallmark of procedural due process: a hearing;

x.    Failed, through its Administrative Reviewer and SGC, to consider the Grade Appeal Committee's summer findings which reflected negatively on Jane Roe's credibility and propensity for truth telling and involved substantially false information;

xi.   Failed, through its Administrative Reviewer and SGC, to properly apply the evidentiary standard to the evidence collected when concluding in the EOC Report and SGC Notice of Hearing Outcome that by a preponderance of the evidence Professor Doe must have (on no specific occasion and at no specific time) placed his hand on Jane Roe's inner thigh some amount (but no specific amount) of times over the course of a half year period, when the only evidence of that specific act was Jane Roe's word against the word of Professor Doe and thus lacking the proper foundation to allow a determination _even_ at the low standard of preponderance of the evidence.

xii.  Failed, through its Administrative Reviewer and SGC, to provide a disinterested tribunal insofar as a witness (Jane's Friend) self-identifying as: (i) "naturally suspicious of men" and (ii) willing "to start a war" on "gender issues," was nonetheless egregiously deemed a credible witness.

xiii. Failed, through its Administrative Reviewer and SGC, to provide a disinterested tribunal insofar as a witness (Professor Guo) was: (i) denoted in the EOC Report at footnote 32 as not testifying competently, and (ii) was biased as Jane Roe's mentor, going so far as

to testify that she was his "dream student", yet was nonetheless egregiously deemed a credible witness.

xiv. Failed, through its SGC, to provide a disinterested tribunal insofar as a witness (Professor Harris) who testified competently, believably, and without bias or undue motivation, was nonetheless egregiously not deemed a credible witness, to the extent the decision by the SGC revealed that they did not believe her testimony that on May 15 Professor Guo only demonstrated an outer knee bump, not an inner thigh grope.

xv. Failed, through its Administrative Reviewer and SGC, to give only perfunctory explanations of the conclusion that Jane Roe's version of the facts—**which included no dates of offense(s), no time(s) of offense(s), and no number of offense(s) <u>over a half year period</u>**—regarding the inner thigh touching should be taken as true over Professor Doe's, when the evidence was that: (i) no one else independently corroborated an experience of inner thigh groping; (ii) only Professor Guo—who testified without credibility and with obvious bias and undue motive—"corroborated" Jane Roe's inner thigh story, and at best that said testimony was hearsay (albeit admissible hearsay); (iii) Jane Roe has serious credibility issues and a propensity for falsity telling; (iv) that Professor Doe has high credibility and a propensity for truth telling; (v) that Professor Doe denied the inner thigh groping; (vi) that Professor Harris has high credibility, a propensity for truth telling, no undue motive or bias, and testified counter to Professor Guo; **furthermore that a perfunctory explanation was the only explanation which could have been given, since there was <u>no evidence</u> allowing a more in depth explanation.**

xvi. Failed, through its EOC office, its Administrative Reviewer, and its SGC, to ever demand, correct, or supplement the insufficient notice to Professor Doe of the true charges against him, i.e., specific date(s), time(s), and number(s) of occurrences at which the purported sexual harassment occurred, thus failing to effectuate sufficient notice to Professor Doe inhibiting if not precluding his ability to have meaningful notice, thus inhibiting if not precluding his ability to prepare a meaningful defense (such as alibis).

xvii. Failed, through its SGC, to allow into evidence Professor Doe's polygraph results when no rule of evidence applicable to the proceedings disallowed such evidence;

xviii. Failed, through its SGC, to allow into evidence the existence of Professor Doe's polygraph exam and his willingness to have the results submitted at all, when no rule of evidence applicable to the proceedings or applicable in North Carolina state courts disallowed such evidence;

xix. Failed, through its SGC and General Counsel, to ensure a disinterested tribunal by condoning multiple *ex parte* communications with UNC General Counsel during the proceedings when UNC is clearly committed to providing "pro-victim" tribunals given its recent federal investigations, campus-wide pressure, national press, and statements from Carol Folt;

xx. Failed, through its Department of Sociology, to even remotely maintain academic norms insofar as Professor Doe was punished far in excess of the EOC/SGC reprimands without justification including <u>punishments that ran counter to findings of the Grade Appeal Committee, the EOC Report, and the SGC</u> that, for example, he never committed grade retaliation or graded unfairly and would thus be perfectly competent to have remained on anonymous comprehensive exam committees. Furthermore that it was the clear intent of the EOC/SGC reprimands to have Professor Doe (wrongly accused as he was) to be rehabilitated and retained at UNC, not constructively discharged after being overtly ostracized and stigmatized by a campus run not by professional administrators or professors, but instead by a small number of hostile students who are out to "start a war" on "gender issues" at all costs.

xxi. Failed to enable Professor Doe to adequately contemplate his appeal rights by: (a) inadequately advising him of them by failing to include the N.C. Gen. Stat. § 150B-45 thirty (30) day limit in the UNC policy cited by the SGC; (b) retaliated against his first chance to further appeal the EOC Report by removing an upcoming spring graduate seminar he was scheduled to teach during the pendency of the SGC process in November of 2015, in excess of the EOC Report reprimand; (c) chilling his further appeal prospects beyond the SGC decision by continuing to retaliate in the form of removing more and more teaching responsibilities in further and further excess of the EOC/SGC reprimands; and (d) by denying Professor Doe's counsel the audio tape recordings of the SGC hearings and only offering to produce a redacted transcript.

196. That for these reasons and through these means, both Professor Doe's liberty interest in his personal and professional reputation and his property interests in his continued contractual employment (soon up for tenure review) were each violated contrary to the guarantees of both federal and state constitutions when he was unjustly and defamatorily subjected to multiple stigmatizing statements and improper State actions which altered his legal status and foreclosed future employment opportunities in an adjudicative process which lacked multiple fundamental protections of procedural due process.

### THIRD CLAIM FOR RELIEF

**(Constructive Discharge & Free Speech Violation)**

197.     That all preceding paragraphs are specifically incorporated by reference and are specifically re-alleged as though laid out in full herein.

198.     That The Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity, through their agents, employees, and/or administrators did deliberately make Professor Doe's working conditions intolerable and thereby force him to resign and not renew his contract by punishing and reprimanding him far beyond the scope of the EOC and SGC opinions insofar as:

    i.    They removed all graduate coursework from Professor Doe;

    ii.    They removed Professor Doe from all committee work, including comprehensive exam committee work which involves anonymous grading;

    iii.    They disallowed Professor Doe from meeting with prospective students;

    iv.    They engaged in, allowed, encouraged, and ratified "town hall" meetings where Professor Doe's confidential information regarding the Title IX hearings—inaccurate and substantially false as such information was—was allowed to be feely discussed, exaggerated, and published to third parties who could not possibly qualify under UNC's policies as "need to know" persons;

    v.    They treated him with overt and callous disregard when he requested teaching relief in light of his wife's near fatal pregnancy complications for which she was hospitalized for over one (1) week; and

    vi.    They even went so far as to violate other tenured professors' First Amendment rights to Free Speech in disallowing, discouraging, and otherwise chilling any professors from testifying in Plaintiff's favor, or otherwise objecting to this harsh treatment of Professor Doe, thereby only making Professor Doe's working conditions further intolerable by alienating him even from supportive colleagues who were made to fear retaliation from UNC if they supported Professor Doe despite his undeserving scarlet letter.

199.     That because of the foregoing, as of June 30, 2018 Professor Doe had been constructively discharged and resigned only as a matter of course.

200.     That Article I, Section 14 of the North Carolina State Constitution guarantees that, "Freedom of speech and of the press are two the great bulwarks of liberty and therefore shall ever be restrained, but every person shall be held responsible for their abuse."

201.     That the North Carolina Supreme Court has described the state constitution's free speech article as "self-executing."

202.     That the First Amendment to Constitution of the United States guarantees that, "Congress shall make no law ... abridging the freedom of speech[.]" U.S. Const. amend. I.

203.     That the First Amendment not providing a direct cause of action, its violations must be brought pursuant to 42 U.S.C. § 1983, which Professor Doe hereby does.

204.     That (i) Professor Doe engaged in protected speech—professing his innocence directly himself through appeals processes, email, and verbal statements and indirectly through the testimony and shows of solidarity by other faculty members—as a citizen which was speech of concern to a public interest insofar as he had been monstrously deemed a deviant sexual harasser whose false reputation as such was being tortiously spread like wildfire in the UNC community by Defendants through their agents, employees, and administrators to the effect of causing objective, measurable alarm in the community; and (ii) that said speech was a motivating and/or but for cause of his demotions and ultimate constructive discharge.

205.     Accordingly, Defendants are liable to Professor Doe for constructive discharge and Free Speech violations, and for all damages so arising therefrom.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract)

206.     That all preceding paragraphs are specifically incorporated by reference and are specifically re-alleged as though laid out in full herein.

207.     That Professor Doe had a valid contract for employment with UNC.

208.     That The Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity, through their agents, employees, and/or administrators did substantially breach perhaps the most material portion of Professor Doe's contract by failing to perform all obligations under the contract, specifically the common law obligation imposed on all contracts to act in good faith and deal fairly, as shown above, principally through: (i) their mishandling of the sexual harassment charges and proceedings in violation of his constitutional rights, as well as (ii) through their mishandling of the months following the January 12, 2016 SGC Notice of Hearing Outcome decision, wherein they engaged in, allowed, encouraged, and ratified the constructive discharge, free speech suppression and retaliation, and defamation of Professor Doe.

209.     That Professor Doe performed all of his obligations under the contract, including acting in good faith.

210.     Accordingly, Defendants are liable to Professor Doe for breach of contract and for all damages arising out of that violation.

## FIFTH CLAIM FOR RELIEF
### (Defamation & Breach of Confidentiality)

211.     That all preceding paragraphs are specifically incorporated by reference and are specifically re-alleged as though laid out in full herein.

212.     That The Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity, through their agents, employees, and/or administrators did defame Professor Doe by slander *per se* through its spoken publication to individuals other than Professor Doe and who did not qualify under UNC's policies as a "need to know" person that Professor Doe had been convicted of the "crime" of sexual harassment and/or the lesser civil/Title IX wrong of sexual harassment, when they knew or should have known that such statements were false in their entirety or else substantially false, or else protected by contractual, common law, and statutory obligations of confidentiality.

213.     That the Defendants in the preceding paragraph committed this tort against Professor Doe on multiple occasions and by various actors through the facts shown above, including specifically, but not limited to the November 13, 2015 "town hall" meeting.

214.     Accordingly, Defendants are liable to Professor Doe for defamation by slander *per se* and breach of confidentiality and for all damages arising out of that violation.

## SIXTH CLAIM FOR RELIEF
### (Negligence)

215.     That all preceding paragraphs are specifically incorporated by reference and are specifically re-alleged as though laid out in full herein.

216.     That The Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity, through their agents, employees, and/or administrators did negligently carry out its own policies and procedures as follows:

    i.    That the above named Defendants in this claim subsection owed a common law duty towards Professor Doe to exercise reasonable care, with due regard for the truth, to: (a) ensure an evenhanded application of procedure, and (b) soberly consider the important and

-52-

irreversible consequences of its actions, as well as Professor Doe's various liberty and property rights and interests generally.

ii. That through the acts set forth above, the above named Defendants in this claim subsection breached that duty by carelessly, improperly, and negligently performing its assigned duties and facilitating a process (and its foreseeable aftermath) that violated the rights and interests of Professor Doe.

iii. In particular, Defendants have negligently trained and supervised the individuals it employs to investigate claims of sexual misconduct, adjudicate those claims, or otherwise implement UNC policies with due regard for the truth and fairness to all parties, and not to over-punish or retaliate in excess of the EOC/SGC reprimands.

iv. Upon information and belief, Defendants train their employees, agents, and administrators (i) to implement the goal of combating "rape culture," a chief element of which is to suppress any doubt which may arise regarding the veracity of sexual assault claimant; (ii) to believe that the number of false accusations in the Title IX context must mirror that of the criminal context (2-8%) when that is an improper comparison in light of the far greater deterrents against false reports which exist in the criminal context; (iii) to otherwise give presumptive credit to the testimony of sexual assault claimants unless there is (functionally) clear and convincing evidence, or something similarly high, of its falsity, in contravention of the requirement that all facts must be determined by a preponderance of the evidence, including facts which point towards a claimant's falsity, lack of credibility, or propensity for truth telling (said facts having abounded in the case at bar yet which were disregarded by the triers of fact or else weighed with an improper standard of evidence and thus effectuated an unjust and unconstitutionally disparate impact on Professor Doe).

217. That as a direct and proximate result of Defendants' negligence Professor Doe has been seriously and irreparably damaged in the following ways, including but not limited to all other claims set forth in this Complaint: (i) having been made to endure extreme emotional and psychological suffering as a result of the Defendants' one-sided treatment of the false sexual harassment charges brought against him; (ii) having been constructively discharged; (iii) having been defamed by slander *per se;* (iv) having had information placed in his personnel file which shall foreclose the ability for him to gain employment at institutions of higher education as a Professor—the career to which he has devoted his life's professional development including recently starting a family under the rightfully assumed future ability to provide for—especially in light of the fact that pursuant to N.C. Gen. Stat. § 126-24 the fox is left guarding the henhouse in the form of Defendant Kenneth T. Andrews retaining the broad and

discretionary power to release such information or not; and thus (v) Professor Doe has and will continue to suffer permanent reduction in lifetime earnings.

218.  Accordingly, Defendants are liable to Professor Doe for negligence and for all damages arising out of that violation.

## DECLARATORY JUDGMENT ACTION
### (Removal of Inaccurate and Misleading Information in Personnel File)

219.  That all preceding paragraphs are specifically incorporated by reference and are specifically re-alleged as though laid out in full herein.

220.  That pursuant to N.C. Gen. Stat. § 1-253, *et seq.* and Rule 57 of the North Carolina Rules of Civil Procedure there exists an actual and justiciable controversy between Professor Doe and Defendants regarding certain rights and obligations pursuant to N.C. Gen. Stat. § 126 *et seq* and Defendant Ann Lemon's ability and/or obligation to remove the inaccurate and misleading information—in light of the above facts and claims—in Professor Doe's personnel file pertaining to the Title IX proceedings.

221.  Specifically, Professor Doe seeks a Declaration from this Court:

    i.  That Defendant Ann Lemon should be required, pursuant to N.C. Gen. Stat. § 126-25(b) to remove the inaccurate and misleading information in Professor Doe's personnel file;

    ii.  That Defendant Kenneth T. Andrews should be enjoined from exercising his otherwise allowable discretion vested in him pursuant to N.C. Gen. Stat. § 126-24; and

    iii.  That any and all preconditions to Professor Doe's right to the declaratory relief request in this action have been satisfied.

## MOTION FOR PRELIMINARY INJUNCTION
### (Against Defendant Kenneth T. Andrews)

222.  That all preceding paragraphs are specifically incorporated by reference and are specifically re-alleged as though laid out in full herein.

223.  That through the facts above it has been adequately shown that Defendant Kenneth T. Andrews harbors and acts upon unfounded antagonism against Professor Doe.

224.  That whilst the above Declaratory Judgment Action is pending which, in part, requests declaratory and injunctive relief from Defendant Kenneth T. Andrews exercise of his discretionary disclosure powers pursuant to N.C. Gen. Stat. § 126-24—the likelihood of success on the merits of which action

-54-

has been adequately plead and shown above—that it is clear Professor Doe is likely to sustain irreparable loss from Defendant Kenneth T. Andrews' interim exercise of his discretionary disclosure powers.

225.     That the irreparable loss is particularly palpable insofar as Professor Doe, having been constructively discharged less than thirty (30) days ago, is actively pursuing employment opportunities and that said prospective employers may be contacting UNC during the pendency of this action and that were Professor Doe to be prejudiced by Defendant Kenneth T. Andrews interim exercise of his discretionary disclosure powers that it could create a gap in Professor Doe's employment record that would irreparably harmful to his future employment prospects, and unjustly so given the falsity of Jane Roe's charges.

226.     That if it is said that Professor Doe has brought this situation on himself, that it must in that instance be observed that Professor Doe faces a Hobson's choice designed to stymie and favor State agencies under the Administrative Procedures Act which imposes a harsh thirty (30) day time limit for bringing Petitions for Judicial Review—which this complaint's claims should be construed as only if, and only and if, deemed necessary—to the effect that he can either (i) pursue and contest these claims in an attempt to clear his good name, or else (ii) do nothing in regards to UNC and attempt to gain employment without this action, but that UNC had taken no single action which leaves Professor Doe with the impression that they will look after his interests in any way or speak kindly or truthfully about him in any way, to the end that Professor Doe has no choice but to simultaneously challenge UNC to clear his name, while also seeking immediate employment so as to not develop an irreversible employment gap in his resume.

227.     That the only protection available to Professor Doe from the above described irreparable loss likely to be sustained is for this Court to preliminarily enjoin Defendant Kenneth T. Andrews from exercising his discretionary disclosure powers pending the resolution of the Declaratory Judgment Action.

## MOTION FOR PRELIMINARY INJUNCTION
### (Against The Board of Governors of the University of North Carolina, UNC, and Chancellor Folt)

228.     That all preceding paragraphs are specifically incorporated by reference and are specifically re-alleged as though laid out in full herein.

229.     That through the facts above it has been adequately shown that Defendants The Board of Governors of the University of North Carolina, UNC, and Carl Folt in her capacity as Chancellor of UNC, by and through their agents, employees, and administrators actively engaged in, condoned, or else ratified the tortious defamation through slander *per se* of Professor Doe.

230.     That whilst the above Fifth Claim for Relief (Defamation and Breach of Confidentiality) is pending—the likelihood of success on the merits of which action has been adequately plead and shown above—that it is clear Professor Doe is likely to sustain irreparable loss from Defendants, by and through their agents, employees, and administrators in the form of further if not increased defamatory acts in retaliation to the present action in which Professor Doe is proceeding with lawfully claimed anonymity.

231.     That the only protection available to Professor Doe from the above described irreparable loss likely to be sustained is for this Court to preliminarily enjoin Defendants, their agents, employees (especially graduate student employees, research assistants, and graduate student instructors), and administrators from further defamatory and breach of confidentiality acts, including but not limited to: social media posts, spoken communication at "town halls" or to any third party not qualifying as a "need to know" person under UNC policies, and published newspaper articles.


## FINAL AND ULTIMATE CLAIM FOR RELIEF
### (*Corum* Claim)

232.     That all preceding paragraphs are specifically incorporated by reference and are specifically re-alleged as though laid out in full herein.

233.     That Professor Doe has a constitutionally protected liberty interest in his personal and professional reputation through his constitutionally protected property interest in his continued contractual, tenure-track (then soon up for tenure review) employment.

234.     That Carol Folt is a party to this action in her official capacity as Chancellor of UNC and as such this Court has before it the necessary parties and issues to allow a *Corum* claim to proceed.

235.     That Professor doe brings his *Corum* claim directly against the State through its actor (Carol Folt) in her official capacity and pleads with this Court to use the common law, which provides a remedy for every wrong, to furnish the appropriate action for the adequate redress of Professor Doe's constitutional violations committed by the State through its actor in her official capacity: Carol Folt, Chancellor of UNC.

236.     That Professor Doe's inadequate state remedies are not rooted in state claims which merely require more of him, but state claims which even if successful cannot remedy his constitutional wrong.

237.     That Professor Doe faces inadequate or else inaccessible state common law or statutory remedies for the reputational and property damage inflicted upon him by UNC through its actions in "Part I" of the Facts of this

Complaint, i.e., the events transpiring up and until the January 12, 2016 SGC Notice of Hearing Outcome, as follows:

i. In violation of their own policy, no "informal" resolution of this matter was even remotely attempted by UNC's EOC office.

ii. That, as described above, no meaningful opportunity to be heard was ever provided by the EOC proceedings or SGC hearings through the multiple procedural and substantive due process violations inherent in all of UNC's EOC proceedings and present in Professor Doe's case in particular.

iii. Even if a meaningful opportunity to be heard at the EOC investigation or SGC hearing stages had been provided, "successful recovery" would not have been possible since the irreparable damage to Professor Doe had already been effectuated by the EOC office failing to attempt even a cursorily "informal" resolution of the matter as (then) required under UNC policy.

iv. That the normal remedy for tortious defamation against his accuser was unavailable to Professor Doe due to the then-intact confidentiality entitlements of Title IX and FERPA

v. That no other claims presented above allow this Court to assign monetary damages for the root of Professor Doe's defamation which was incepted in 2015 through the unfair, one-sided, and due process lacking procedures and substance of the EOC proceedings.

vi. That, as stated in the Third Claim for Relief above, the actions of Defendants including Carol Folt in her official capacity implicate free speech violations which are self-executing under the North Carolina Constitution and brought as a 42 U.S.C. § 1983 claim regarding the Frist Amendment to the Constitution of the United States, insofar as Professor Doe engaged in protected speech of concern to the public and as a citizen when he made efforts during the EOC/SGC proceedings to proclaim his innocence, including through others, and that his efforts were discouraged, chilled, and eventually the motivating factor, but for, and proximate cause of his serial demotions and ultimate constructive discharge.

238.    *Ubi jus ibi remedium* ('where there is a right, there is a remedy').

239.    Accordingly, Defendants are liable to Professor Doe for violation of his state constitutional rights and for all damages arising out of that violation which should be made resolved by an equitable remedy fashioned by this court's common law and state constitutional powers as announced under *Corum*.

-57-

240. That a frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty.

241. That North Carolina is still a constitutional democracy.

242. **That a good name is more desirable than riches, and that to be esteemed is better than silver and gold.**

WHEREFORE, Plaintiff this Honorable Court:

1. That this Complaint be taken as an affidavit upon which future Orders of this Court may be based;

2. For entry of an Order vacating the EOC Report and SGC Notice of Hearing Outcome, or in the alternative remanding for a new trial, or in the alternative remanding for findings of fact and conclusions of law consistent with an opinion of this Court;

3. For entry of an Order reinstating Plaintiff to his former post of employment with all the rights of committee work and rights to advise and collaborate with students as was in place prior to May of 2015, or in the alternative awarding judgment in an amount to be determined at trial but not less than $25,000 against The Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity as Chancellor of UNC for Plaintiff's constructive discharge and free speech violations;

4. For entry of an Order requiring specific performance of Plaintiff's contract for employment, or in the alternative awarding judgment in an amount to be determined at trial but not less than $25,000 in Plaintiff's favor for The Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity as Chancellor of UNC for breach of their contract with Plaintiff;

5. For entry of an Order awarding judgment in an amount to be determined at trial but not less than $25,000 in Plaintiff's favor for the Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity as Chancellor of UNC for defamation of Plaintiff by slander *per se* through their agents, employees, and administrators;

6. For entry of an Order awarding judgment in an amount to be determined at trial but not less than $25,000 in Plaintiff's favor for the Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity as Chancellor of UNC for negligently harming Plaintiff through their agents, employees, and administrators as described above;

7. For entry of an Order Declaring the rights and obligations of the parties to be that the Title IX proceedings, reprimands, and all other such related

documentation in Plaintiff's file be removed by Ann Lemon as it is clearly inaccurate and misleading;

8. For entry of an Order preliminarily enjoining Defendant Kenneth T. Andrews from exercising his discretionary disclosure powers under N.C. Gen. Stat. § 126-24 pending the resolution of the Declaratory Judgment Action;

9. For entry of an Order preliminarily enjoining Defendants The Board of Governors of the University of North Carolina, UNC, and Carol Folt in her official capacity as Chancellor by and through their agents, employees, and administrators to immediately cease and desist all defamation and breaching of confidentiality of Plaintiff's connection to these Titlve IX proceedings, pending the resolution of all claims herein;

10. For entry of an Order fashioning a *Corum* remedy in the form of a judgment in Plaintiff's favor awarding him monetary damages in an amount to be determined at trial but not less than $25,000 against Defendant Carol Folt in her official capacity as Chancellor of UNC to redress the defamation incurred from May of 2015 through January 12, 2016 in the course of the Title IX proceedings;

11. That the costs of this action to be taxed against Defendants;

12. For trial by jury; and

13. For such other and further relief as The Court deems just, proper, and equitable.

This the 30th day of July, 2018.

LOFTIN & LOFTIN, P.A.
117 N. Churton St
P.O. Box 733
919.732.9748 (o)
919.732.4241 (f)

Jason R. Jones
NC Bar No. 49302

John D. Loftin
NC Bar No. 16723